[Cite as *State v. McNeill*, 2018-Ohio-2659.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-64 |
| | : | |
| v. | : | Trial Court Case No. 2016-CRB-2342 |
| | : | |
| TSEHINESH Y. MCNEILL | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of July, 2018.

. . . . . . . . . . .

KAYLA E. ROWE, Atty. Reg. No. 0096320 and MATTHEW B. DIBARTOLA, Atty. Reg. No. 0088702, Clark County Prosecutor's Office, 50 East Columbia Street, Fourth Floor, Springfield, Ohio 45502
    Attorneys for Plaintiff-Appellee

MICHAEL R. PENTECOST, Atty. Reg. No. 0036803, 117 South Main Street, Suite 400, Dayton, Ohio 45422
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the July 13, 2017 Notice of Appeal of Tsehinesh Y. McNeill. McNeill appeals from her judgment entry of conviction, following a March 2, 2017 jury trial, in Clark County Municipal Court, on one count of theft, in violation of R.C. 2913.02(A)(1), a misdemeanor of the first degree. On June 19, 2016, McNeill removed eight bracelet watches and four pairs of shorts, in total valued at $347.92, from the Springfield Kohl's department store. The municipal court sentenced McNeill to 35 days in jail, and it suspended 30 days of the sentence upon the conditions that McNeill not commit any new theft offenses and pay court costs. Having reviewed the record, we hereby affirm the judgment of the municipal court.

{¶ 2} The record reflects that McNeill pled not guilty on July 25, 2016. On September 23, 2016, counsel for McNeill filed a motion to withdraw. A hearing was held on the motion on October 25, 2016, with the assistance of an interpreter. McNeill is from Eritrea, and Tigrinya and Amharic are her native languages. In an entry, the municipal court determined as follows:

Counsel's motion indicates the defendant no longer wishes for him to represent her. The defendant indicated that she can no longer pay counsel. She first indicated she was no longer employed and was attending school, but then stated that she left her prior job to accept employment as a bus aid. The Court will not intervene to settle a contract dispute between counsel and the defendant.

Accordingly, the motion to withdraw is denied * * *.

{¶ 3} On October 28, 2016, McNeill filed a "Demand for Jury Trial," and on October

31, 2016, the trial date was scheduled for December 8, 2016, with a pretrial conference scheduled on December 7, 2016. At the pretrial conference, McNeill rejected the prosecutor's offer to plead guilty to a reduced charge of unauthorized use of property, a fourth degree misdemeanor. McNeill's mother-in-law, Angela Spencer, was present and advised the court that McNeill is indigent. The court indicated that it would reschedule trial and appoint new counsel to represent McNeill. McNeill filed an affidavit of indigency on December 7, 2016. On December 12, 2016, appointed counsel for McNeill filed a notice of appearance.

{¶ 4} Trial was rescheduled for February 9, 2017, and a pre-trial conference was held on February 8, 2017, at which time the prosecutor renewed its prior offer to amend the charge to unauthorized use of property. McNeill declined the offer. McNeill again requested an interpreter for trial, and the court denied the request.

{¶ 5} On February 9, 2017, the State requested a continuance due to the unavailability of a witness employed at Kohl's, and McNeill again requested an interpreter for trial. Counsel for McNeill advised the court as follows:

> Your Honor, Miss McNeill, of course does not want to proceed to trial without an interpreter available to her. Miss McNeill was not born in this country. She was born in a small country in east Africa. I believe her native language there was Tigrinya. She has been evaluated by Clark State. Basically they have noted that she does need some basic adult literacy to understand. She can converse in English very well. She just doesn't understand higher concepts, and we believe an interpreter should be available to her to make sure she does understand the situation and the

moves and the cross-examination that prosecution will put her under.

{¶ 6} In response to questions from the court, counsel for McNeill indicated that McNeill has lived in the United Stated for 20 years, and that she is employed as a bus aid in the Springfield school system. McNeill acknowledged that in the course of her work, she interacts with the administration, the bus driver, and the students on the bus without the aid of an interpreter. McNeill advised the court that she previously worked at Rite Aid as a cashier, also without the aid of an interpreter. Prior to that she indicated she was employed in Washington, D.C. The following exchange occurred:

THE COURT: * * * The record will reflect the Court used the Supreme Court's interpretive service on the 25th day of October of 2016 during the motion for Mr. Bayless to withdraw. Reviewing of that transcript indicates and reveals that the Defendant answered questions on multiple occasions before the interpreter had finished interpreting the question.

The record will also reflect the Defendant has had personal face to face conversations in English with this court's administrative staff over two transcripts which she has ordered and paid for. The record will reflect this court has had two face to face conversations with the Defendant as the court exited the courtroom when she was in the waiting area. Those conversations were about the transcripts she has ordered and paid for.

Most recently, the Defendant was before the court in Case No. 16 TRD 15134 which was a speed violation, 51 in a 35 mile an hour zone. The Defendant spoke with the state's attorney, negotiated a plea bargain in that case to plead to 39 in a 35. She then appeared in front of the Magistrate,

entered a guilty plea to that charge and was fined.   She had paid the fine and on the 27th day of January of this year filed a Motion for * * * expungement of verdict and return of fine, which the court is treating as a Motion to withdraw the plea and vacate the conviction.   That document is filed with the court.   It is typewritten in English with the Defendant's signature at the bottom.

MR. CHAVEZ:   Just to clarify about that, Your Honor.   My understanding from talking to Miss McNeill was that her mother in law did that for her under her advisement.

THE COURT: Then the Defendant shouldn't have signed it without indicating the same.

MR. CHAVEZ:   Yes, under her advisement of telling her what to write there.

* * *

THE COURT:   And the Court's advice to your client is that she take advice from you, her lawyer, and not this woman who continually advises her and is giving her poor advice.   For all of the reasons I've just articulated, the Court will not bring an interpreter in for the March the 2nd trial.

**{¶ 7}** The jury trial and sentencing both occurred on March 2, 2017.   The jury heard the testimony of Christine Amy Faisick and Cynthia Schneider of Kohl's, and two DVDs taken from Kohl's security cameras were admitted into evidence, as well as Faisick's incident report and a photograph of the items that belonged to Kohl's and were removed from McNeill's possession.   McNeill also testified.

**{¶ 8}** Faisick testified that she is the loss prevention supervisor for the Springfield Kohl's, and that she was so employed on June 19, 2016. She testified that she observes shoppers by means of 32 cameras in the store. Faisick testified that it was brought to her attention that McNeill entered the store carrying a Kohl's shopping bag, and that Faisick has experience with customers attempting to conceal stolen merchandise in bags brought into the store. She testified that she observed McNeill in the Jewelry Department place a bracelet watch on her wrist, and place another one in her cart. She stated that she observed McNeill walk behind a rack of clothing in the Misses Department, and that when she emerged from behind the rack, the Kohl's bag "was more full than it had been before." Faisick stated that she observed McNeill proceed to Customer Service and exchange merchandise. According to Faisick, McNeill then "went to the Young Girls Department, selected shorts from there." Faisick testified that McNeill then "went back to the Junior Department, where she selected three Mudd shorts," and then she went to "the Misses side registers, point of sale over there. She made a small purchase and then passed the point of sale and left the store through the first doors." Faisick stated that she, accompanied by a store manager, stopped McNeill, introduced herself, and took McNeill to her office. Faisick testified that she told McNeill that she wanted the bracelet watch she was wearing returned, as well as the other bracelet watch and any other property belonging to Kohl's.

**{¶ 9}** Faisick identified, as Exhibit D, her incident report, which reflects that 11 items were removed from McNeill's possession that she did not pay for, namely the eight bracelet watches, priced at $24.99 each, two pairs of Mudd Bermuda shorts, priced at $38.00, one pair of Mudd Bermuda shorts priced at $36.00, and one pair of girl's Vanilla

Star Bermuda shorts priced at $36.00. Faisick identified, as Exhibit E, a photograph taken by her of the items. Faisick identified, as Exhibit A, a disk containing the recording from "Camera 29" in the store, and as Exhibit C, a disk containing the recording of "Camera 24," both of which were burned by her on the day of the theft. She testified that "Camera 29" records continuously and depicts McNeill's time inside the store after Faisick was alerted to her presence. Exhibit A was played for the jury, and Faisick testified that it accurately represented what she observed on the day of the theft. Faisick testified that she first observed McNeill at 1:05 p.m., and that she stopped her at 2:03. Finally, Exhibit C was played for the jury, which Faisick testified depicts McNeill leaving the store.

{¶ 10} Cynthia Schneider testified that she was employed as an Area Supervisor at the Springfield Kohl's on June 19, 2016. She testified that on June 19, 2016, McNeill approached her at the Misses registers and said that she "needed to either exchange or return some things, so I directed her back to Customer Service" in the rear of the store. Schneider testified that she did not have problems communicating with McNeill in English and that McNeill appeared to comprehend what was said. Schneider testified that McNeill "had a [Kohl's] bag that had items in it." She stated that there were "multiple [Kohl's] bags within the bag," with "merchandise in each bag," which aroused her suspicion. Schneider testified that she communicated with Loss Prevention via her radio headset, and that she reported to the Loss Prevention Office and viewed the video of McNeill placing the watch on her wrist. Schneider stated that when McNeill went past the point of sale, she was stopped and taken to the Loss Prevention Office. Schneider's testimony is consistent with Faisick's regarding the removal of the Kohl's merchandise from McNeill's possession. She testified that she "compared receipts to see if the even

exchange items matched up." Schneider testified that McNeill had eight bracelet watches and four pairs of shorts for which she lacked a receipt.

{¶ 11} Officer William Evans of the Springfield Police Department testified that he was dispatched to the Springfield Kohl's on June 19, 2016, on a shoplifting report. After speaking to Faisick at the store, he testified that he arrested McNeill, transported her to police headquarters, and advised her of her rights. Evans testified that she advised him that she understood her rights. Evans stated that McNeill "seemed like a very nice lady," and that he asked her why she committed the theft. McNeill responded, "I was being stupid," according to Evans.

{¶ 12} Finally, McNeill testified that she was born in "east Africa, name is Eritrea. The city of my county is Asmara." She testified that she worked in Washington D.C., "out at the cemetery. And like a tour, they come, like a thousand, a thousand people for visit." She testified that when her boss passed away, the company was sold, and "after that, I work at, it was Rite Aid" as a cashier for three or four years. McNeill testified that she also worked at a daycare. McNeill testified that she asked for and received a transfer from Rite Aide, but that her job is not full-time, so she also works as a bus aid for Springfield schools.

{¶ 13} McNeill testified that she shops at Kohl's "all the time," and that "only I can go to get clothes or to get jewelry or to get anything for my daughter, only I can go to Kohl's, because I have a credit limit with them and I have a good customer service with them." McNeill testified as follows regarding the events of June 19, 2016:

> The way I got that day it's Father's Day, I remember that I go to
> shopping and I have some pants, like four pants to go to exchange the size,

or I have to go to like in a department to find other kinds. But before I work, I could have the lady, I show her my receipt and then I show her my stuff. And then she told me, say, "Go to customer service and they told me, say, if you need exchange, the same size, and then you just go to, pick whatever you want and then go to the cashier. And then exchange it. I say, "OK".

**{¶ 14}** McNeill testified that she continued to walk around Kohl's because her daughter was participating in a church program and she was waiting for it to conclude. The following exchange occurred:

Q. * * * And you said, you've seen the video that was played here today, is that correct?

A. Yes.

Q. And I think, we all saw you select a bracelet.

A. Yes.

Q. What happened?

A. OK, the bracelet I had it in my hand, I did it. And I can tell you I never steal. My mother in law, she call me and my auntie, she call me and at (inaudible) they call me; and concerned with everything. I just forgot it. I say, I know I had it in my hand but when I go to the register, complete, I forgot it. * * *

* * *

Q. What did you do with the other jewelry?

A. I just drop, when they call me to pay it, the phone, and it's just drop, it's my purse.

Q. In your purse?

A. Yes.

Q. Why did you put it in your purse?

A. I don't do it purposely. When I pick it out, my phone, when they call me, I just dropped it, but I don't mean to, to do that. But I just, this has happened but I say, "I'm sorry". When she stopped me. I say, "I'm sorry, can I buy it"? She told me, she says, "Shut up". * * *

{¶ 15} McNeill further testified as follows:

Q. And why did you approach Customer Service when you came in?

A. I asked first, the supervisor, I don't know. She said the supervisor. I asked the lady, I have this, items to be exchanged or to return. And she opened my bag. She see how many I had and then she see the receipt, she told me, she say, go to Customer Service. I go to Customer Service and showed them, to ask them what I have to do. And the lady, she told me, say go get it from the floor and then go to the cashier, and cashier, they can help you.

* * *

Q. OK, and at some point you went to check out. What happened at checkout?

A. When I go to the checkout to buy this pair, and when I give her for the cashier was my receipt, exchange it, and to buy the (inaudible) - - And the lady, when I show her first when I look, she come to help me decide,

\* \* \*; but she put it in the bag, something in my bag. I don't know what she put it. I don't see her when I give it to the cashier to ring it up, and then she handed it to me, I put in my, in the cart. That's all I can know.

Q. OK, and what happened after you left the checkout stand?

A. And then I just complete, I forgot about it, the jewelry. I don't, completely forgot about that. I just say, still when she stopped me, I tell her, I say, "I'm sorry, can I buy it"? She give it to me, say, "Shut up". \* \* \*

{¶ 16} The following exchange occurred on cross-examination:

Q. So you bring the stuff in. You're going to make your exchange. You talk to somebody. They say go to the back?

A. Yes.

Q. Make the exchange?

A. Yes.

Q. You do a little shopping on your way to the back?

A. Yes.

Q. You watched the video, right?

A. Yes.

Q. First you decide, I like this watch. I'm gonna put it on.

A. Uh hum.

Q. You tried it out, right? When did you put the seven other bracelets in your purse?

A. When I pick up all of them is in my hand at first. Now when my phone is called, it's dropped in my, in the cart. My purse –

\* \* \*

Q. They, they just happened to fall into your purse?

A. Yes, sir.

Q. OK. So your purse was open, the cart was open - -

A. 'Cause when I grabbed my phone to take it off, it's my purse is open, yes.

\* \* \*

Q. And then you forget about it?

A. I forget about them, yes.

Q. So there's seven in there, got one on the wrist, you don't remember?

A. Yes.

{¶ 17} McNeill testified that when she entered the store, she had four pairs of pants or shorts with her, and that she could not exchange all of them because she could not find the right sizes. She stated that an employee put something in her bag. When asked if she was set up, McNeill responded, "I believe so. That's why they did." She testified, "when the lady she come to the register, when she helping me, she bended to put it in the bag."

{¶ 18} McNeill asserts two assignments of error herein. Her first assigned error is as follows:

THE TRIAL COURT ERRED BY FAILING TO GRANT APPELLANT'S REPEATED REQUESTS FOR AN INTERPRETER FOR TRIAL PROCEEDINGS.

{¶ 19} McNeill asserts that "the trial court abused its discretion in repeatedly refusing [her] requests for the appointment of an interpreter." She asserts that "the trial court's use of extra-judicial contacts between itself and its staff and reference to the docket of unrelated proceedings in which there is no evidence the court was a participant to deny Appellant an interpreter is unreasonable * * *." McNeill asserts that while she "may be able to speak English sufficiently to hold a menial job or engage in a conversation, she does not, as attested by her evaluation at Clark State, have such functioning in legal proceedings and cannot readily understand the questioning and proceedings." She argues that the "transcripts are replete with examples of moments when McNeill clearly did not understand questions or concepts that were being asked of her."

{¶ 20} As this Court has noted:

The Confrontation Clause of the Sixth Amendment to the United States Constitution contains three essential elements: that the defendant be afforded the opportunity to be physically present at trial, that he be competent to assist in his own defense, and that he be able to understand the language of the forum. 3 LaFave & Israel, Criminal Procedure (1984), 9, Section 23.2(c). * * *

*State v. Mahan*, 2d Dist. Montgomery No. 15071, 1996 WL 65250, *2 (Feb. 16, 1996).

{¶ 21} As this Court has further noted:

A defendant in "a criminal case * * * is entitled to hear the proceedings in a language that he can understand." (Citation omitted.) *State v. Al–Mosawi*, 2d Dist. Montgomery No. 24633, 2012–Ohio–

3385, ¶ 8. To this end, R.C. 2311.14(A)(1) states that a "court shall appoint a qualified interpreter" to assist a party to a legal proceeding "who cannot readily understand or communicate" because "of a hearing, speech, or other impairment."

*State v. Zaragoza*, 2d Dist. Montgomery No. 27290, 2017-Ohio-7944, ¶ 12. "Among those who have 'a hearing, speech, or other impediment,' the legislature includes 'person[s] who speak[ ] a language other than English.' R.C. 2311.14(A)(2)." *Id.* at ¶ 12, fn. 5.

{¶ 22} As this Court has noted:

The trial court has broad discretion in determining whether a criminal defendant requires the assistance of an interpreter. *State v. Saah,* 67 Ohio App.3d 86, 95, 585 N.E.2d 999 (8th Dist.1990). Therefore, this court will not reverse the trial court's decision in this regard absent a showing that the trial court abused its discretion by acting unreasonably, unconscionably, or arbitrarily. *Id.,* citing, *State v. Apanovitch,* 33 Ohio St.3d 19, 22, 514 N.E.2d 394 (1987).

*Al-Mosawi* at ¶ 9.

{¶ 23} As this Court has further noted:

The decision regarding whether a defendant is entitled to a court appointed language interpreter is initially based on the trial court's assessment of the defendant's apparent ability to comprehend the English language and communicate therein. See, *State v. Quinones* (Oct. 14, 1982), Cuyahoga App. No. CR–59478, unreported, citing *Perovich v.*

*United States* (1907), 205 U.S. 86 and *Suarez v. Desist* (1962), 309 F.2d 709. * * * [A]n imperfect grasp of the English language may be sufficient as long as the defendant has the ability to understand and communicate in English. See, *Perovich,* supra; *Saah,* supra; *State v. Davis* (May 7, 1981), Cuyahoga App. No. 42672, 42737, 42738, unreported.

*State v. Castro*, 2d Dist. Montgomery No. 14398, 1995 WL 558782, *4 (Sept. 20, 1995).

{¶ 24} Having reviewed the record, we conclude that an abuse of discretion is not demonstrated. As noted above, McNeill has been in this country for 20 years and held three jobs, without the aid of an interpreter, which required interaction with co-workers and the public. As the trial court noted, a review of the transcript of the hearing on the motion to withdraw reveals little evidence of translation difficulties. For example, without the use of the interpreter, McNeill acknowledged in response to questions from the court that she hired Bayless to represent her, and that she paid him to do so. When asked if she told Bayless that she no longer wanted him to represent her, McNeill responded, "I'm not working and I do not have money and I can, I do not afford Mr. Bayless."

{¶ 25} McNeill specifically directs our attention to multiple instances at the December 7, 2016 pre-trial conference, trial and sentencing where she claims her lack of understanding of the proceedings is revealed. We conclude that when the exchanges are considered in context and in their entirety, it is clear that McNeill is able to comprehend the English language and communicate therein. For example, McNeill directs our attention to the following exchange between the court and McNeill at the pre-trial conference:

Q. OK, so I don't see language as a barrier to communication –

A.   Um - -

Q - - so I'm not going to put the interpreter on the phone today.   You understand?

A.   But, not I can't understand everything, what he say.

{¶ 26}   However, immediately prior to the above cited exchange, the record reflects the following conversation occurred:

Q.   Miss McNeill, I'm not going to get the interpreter on the phone today because you and I have had several conversations in English and communicated effectively, correct?

A.   Yes.

* * *

Q.   I came off the bench one morning and you were standing in my entryway with a letter about a transcript, and I indicated to you that you could call and make a telephone appointment with the secretary in order to make arrangements to retrieve that, correct?

A.   Yes.

* * *

Q.   Then our subsequent conversation was when you called on the telephone and I indicated to you that she was not in the office.   It was just moments after our face to face conversation, correct?

A.   Yes.

Q.   And [I] indicated to you, you need to give it some time and call her to make arrangements?

A. Arrangements for what? * * *

Q. To pick up the transcript.

A. Yes.

Q. Yes. And have you picked that up yet?

A. Yes, I do.

{¶ 27} Subsequently, counsel for McNeill indicated to the court that he discussed the offer of the amended charge with McNeill, and that she rejected it and asked him to renew the motion to withdraw, for financial reasons, and because "she did not feel like we were on the same page." The court indicated to McNeill that it was "not going to get involved in a contractual dispute with you and your lawyer. Do you understand that?" McNeill responded, "No, I don't understand." McNeill nevertheless acknowledged that she entered into a contractual agreement with Bayless, but she asserted that she "can't afford the money to pay him." The court noted that it would not revisit its prior ruling on the motion to withdraw. In addition, the following exchange occurred:

[THE COURT] Q. Mr. Bayless says now that you told him that he can't, and what were your words, Mr. Bayless?

MR. BAYLESS: That we are not on the same page.

Q. - - that you're not on the same page. What does that mean, Miss McNeill?

A. I don't understand what's - - not on the same page? I don't understand that. The same page.

{¶ 28} Counsel for McNeill then advised the court that much of his conversation with McNeill took place with her family members present, "so that language wasn't from

Miss McNeill directly, but from her family with her present, of course." The court then asked Angela Spencer, McNeill's mother-in-law, why she did not feel that Bayless was protecting McNeill's interests, and Spencer replied that Bayless "has not allowed her to or helped her get a public defender," and that he was retained for the "limited purpose" and "limited engagement" to "discuss with the prosecutor the fact that the charges should be dismissed." When the court asked Bayless if the contract was for the limited purpose of securing a dismissal of the charges, Bayless replied, "That was not explicitly stated, Your Honor. It's just in the representation of the theft charge." After Spencer indicated to the court that "it is [McNeill's] right based on her income to be provided the services of a public defender," the court asked "Mr. Bowen" to interview McNeill, and after a break in the proceedings, the court indicated it would appoint counsel to represent McNeill.

{¶ 29} While McNeill may have been unfamiliar with the idiom "on the same page," we cannot conclude, as she asserts, that the transcript reflects she did not understand the proceedings in the course of that exchange. She again conveyed to the court that she was unable to afford to pay Bayless, and we conclude that any confusion reflected in the transcript regarding her lack of familiarity with the isolated phrase, "on the same page," is not indicative of an overall lack of understanding of English. Further, any misunderstanding regarding the nature and extent of Bayless' representation is akin to that common among defendants in general who are not trained in the law and may have unrealistic expectations of their lawyers' ability to obtain a certain result.

{¶ 30} McNeill further directs our attention to two instances in the trial transcript where she indicated a lack of understanding of the questions asked of her. The first exchange in McNeill's direct testimony is as follows:

Q.    So when you selected these bracelets –

A.    Uh, I don't understand.

Q.    I said, when you selected these bracelets, did you have the intention of buying those?

A.    What does that mean?   I don't understand it.

Q.    Did you have, were you going to buy those bracelets?

A.    Yeah, I just wanted to buy them but I forgot completely when I go to the register.   Even the lady, the second one, she want to help me. She came to me, say um, Miss McNeill or excuse me, customer, you have something, you want to buy it?   She, nobody offered that, as a customer. But I don't mean to, to do that but you know, as a human, I forgot it, yes.

**{¶ 31}** The second exchange is at the conclusion of McNeil's' direct examination when McNeill testified that she was arrested at the store and taken to jail.   It is as follows:

Q.    OK, and –

A.    And they don't take me my car, but they take me in the police car.   They bring me in here.   And they take me out a stair.   I don't know exactly what is it, but they take me downstairs and then they tell me, say, they search me, everything, and another woman she come.   And then they ask me questions.   I tell them, say, "I don't do this purposely.   I forgot it." Like, you know, it's just like stupid, think I did it.   I just, I say, "sorry." You don't fool me, you're lying.   You're not supposed to do that.   I say, I say, "Yes, but I'm not meaning to do that but, and I just forgot it."

Q.    So you said, you were being stupid?

A. Yeah, but that means, I'm not saying I'm stupid, but I forgot. I'm very stupid, yes. Yeah.

* * *

Q. What were you referring to when you said, "I'm stupid"?

* * *

THE COURT: Excuse me. Mr. Chavez, was the question, "What did you mean when you said, I was being stupid?"

MR. CHAVEZ: Yes, Your Honor.

* * *

THE COURT: Then that's the question you need to answer, Miss McNeill. What did you mean when you said –

A. I don't understand what does that mean, but I just say, "I'm so sorry. I'm just, I forgot about it. I'm stupid." But I forgot, that means, I say I'm stupid for myself.

Q. So when you went to Kohl's' that day, did you have any intention to steal any items?

A. No.

Q. What was your intention?

A. To buy stuff, to exchange my stuff.

{¶ 32} We conclude, that in the above exchanges, McNeill effectively responded to questions and communicated to the jury that she intended to exchange her items and purchase the bracelet watches, but she asserted that as a result of human error, she forgot that the watches were in her possession when she proceeded to the cash register.

McNeill further related her exchange with Faisick and Schneider in the office, where she indicated that she was "stupid" to forget the bracelet watches, which she maintained she did not intend to steal.

{¶ 33} McNeill further directs our attention to the following exchange in the course of her cross-examination:

> Q. Being a cashier, you have to interact with the public, is that right?
>
> A. Yes. I don't understand, what does that mean, public?
>
> Q. Other people.
>
> A. Yes.
>
> Q. You have to talk with them?
>
> A. I can talk with them, they ask for the price.
>
> Q. Ask you a question? You have to –
>
> A. - -about the price. Uh hum.
>
> Q. - - to check a price?
>
> A. Yes.
>
> Q. You have to give them an answer?
>
> A. Yes.

{¶ 34} When read in its entirety, the above exchange reflects that McNeill understood that she was being asked if, in the course of her work, she was required to communicate verbally with those around her, and that she responded affirmatively.

{¶ 35} Finally, McNeill directs our attention to the following exchange that occurred after the court imposed sentence:

> MR. CHAVEZ: Do you have any questions about anything the

Judge went over right now? The judge gave you court costs in the case. She did not fine you. She gave you thirty five days in jail. The Judge is suspending thirty of those days today, so the Judge is going – so you'll have to serve five days. She's giving you to June 8th to pay the court costs here. Do you have any questions about anything the Judge just went over?

MS. MCNEILL: Can I talk to my mother in law?

(Woman): She doesn't understand.

THE COURT: Do you have any questions, Miss - -

MS. MCNEILL: I don't understand the offer you want to - -

THE COURT: You're going to jail for five days beginning momentarily. I'm suspending thirty more days on two conditions. Number one, you are not again to commit any type of theft offense and number two, by the 9th day of June at nine a.m., you are to pay in full the costs of this case, minus the costs that were incurred on the 9th of February for the jury that was brought in and not used. That will be all today.

{¶ 36} We cannot conclude that McNeill's request to speak to her mother-in-law at sentencing reflects a lack of understanding of the proceedings, and we find that her grasp of English, though imperfect, is sufficient, since she understood and communicated in English throughout the proceedings as demonstrated above. In other words, we cannot conclude that the trial court abused its discretion in denying her request for an interpreter. McNeill's first assignment of error is overruled.

{¶ 37} McNeill's second assignment of error is as follows:

THE JUDGMENT OF THE TRIAL COURT IS AGAINST THE

MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 38} McNeill asserts that the "focus of the defense was that McNeill did not have the intent or purpose to deprive Kohl's of property as required for a conviction under R.C. 2913.02." She argues that the "video from the store cameras shows McNeill place the one bracelet on her wrist, but does not show how the other bracelets got into her purse. It likewise does not show McNeill place any merchandise in the bag she brought with items to exchange." McNeill asserts that "the State's case regarding this element is that the items were there, she didn't pay for them, so she must have had the purpose to deprive Kohl's of the property. However, this assumption is clearly and credibly refuted by McNeill's explanation that she simply forgot that the one bracelet was on her wrist as well as the others that had fallen into her purse when she answered her phone thinking there may be an issue with her daughter that was at a church program." According to McNeill, the "State attempted to argue that McNeill's statement to Officer Evans, when asked why she did it, that she was 'being stupid' amounted to a confession." She asserts that she "explained, however, through her broken English, that she had never had any intent to steal anything and what she meant when she said she was being stupid was the fact that she forgot about the bracelets on her wrist and in her purse made her feel stupid." McNeill asserts that "it is clear that the jury lost its way in weighing the evidence, particularly as to the element of purpose to deprive, and thus created a manifest miscarriage of justice."

{¶ 39} As this Court has noted:

"[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the

evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009–Ohio–525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, at 175.

*State v. King*, 2d Dist. Montgomery No. 27432, 2017-Ohio-8910, ¶ 9.

**{¶ 40}** R.C. 2913.02 provides: "(A) No person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * in any of the following ways: (1) Without the consent of the owner or person authorized to give consent." The State was required to prove that McNeill acted purposely by acting with a

specific intent to deprive the owner of property. R.C. 2901.22(A). Pursuant to the definition of "deprive" in R.C. 2913.01(C), the State could prove McNeill's intent to deprive the owner of property by establishing that she took property without giving proper consideration or payment, or without reasonable justification or excuse for not giving proper consideration or payment. R.C. 2913.01(C)(3).

> The Ohio Revised Code does not define what constitutes "reasonable justification or excuse" as applied to this element of a theft offense. Therefore, the jury was permitted to determine from the evidence, based on their collective experience and common sense, whether [the defendant's] failure to pay for the items taken from the store was reasonably justified or excused.

*State v. Campbell*, 2d Dist. Montgomery No. 26575, 2016-Ohio-598, ¶ 10.

**{¶ 41}** We have reviewed the recordings from the store cameras, State's Exhibits A and C, and we conclude that they are consistent with Faisick's testimony regarding her observations of McNeill in the store and her being stopped after she passed the point of sale. As noted above, McNeill effectively communicated at trial her claimed defense that she did not intend to deprive Kohl's of the eight bracelet watches and four pairs of shorts found in her possession. The jury, however, observed McNeill testify, viewed State's Exhibits A and C, and clearly determined that she removed the property at issue from Kohl's without reasonable justification or excuse for her failure to pay. In other words, the jury determined that McNeill's justification or excuse for her failure to pay for the items, namely that she "simply forgot" that the eight bracelet watches were in her possession, and that a Kohl's employee set her up by placing additional items in her bag, unbeknownst

to her, were not credible. We defer to the jury's assessment of credibility. Having reviewed the entire record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. Since McNeill's conviction is not against the manifest weight of the evidence, her second assignment of error is overruled.

{¶ 42} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Kayla E. Rowe
Matthew B. DiBartola
Michael R. Pentecost
Hon. Denise L. Moody