[Cite as *State v. Weller*, 2024-Ohio-2554.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

STATE OF OHIO                      :
                                   :
          Appellee                 :     C.A. No. 2023-CA-41
                                   :
v.                                 :     Trial Court Case No. 2023 CRB 688
                                   :
JUSTIN T. WELLER                   :     (Criminal Appeal from Municipal Court)
                                   :
          Appellant                :
                                   :

. . . . . . . . . . .

O P I N I O N

Rendered on July 3, 2024

. . . . . . . . . . .

MATTHEW T. WATSON and CHRISTOPHER R. BUTLER, Attorneys for Appellant

MATTHEW B. DIBARTOLA, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Justin T. Weller appeals from his conviction in the Champaign County Municipal Court following a bench trial on one count of theft. He claims that the trial court erred in finding him guilty because theft of abandoned property is a legal impossibility. Alternatively, he argues that he reasonably believed the personal property at issue had been abandoned and thus the State failed to prove the required mens rea for theft. For

the following reasons, the trial court's judgment will be reversed.

## I. Facts and Procedural History

{¶ 2} In November 2021, Hunter Jones began leasing an apartment in downtown Urbana. The building included a downstairs commercial unit and Jones's upstairs apartment. On June 1, 2023, Urbana Tomorrow, LLC, a company in which Weller had an ownership interest, purchased the property. After Jones failed to timely pay her June rent, Weller and Jones exchanged a series of text messages regarding her unpaid rent. Jones asked for several extensions and provided explanations for the delays in payment. Jones ultimately paid her June rent on June 23, 2023.

{¶ 3} Jones also did not pay her July rent on time. She again repeatedly promised and failed to make the delinquent rent payment. On July 14, Weller posted a three-day notice to vacate, which indicated that Jones needed to vacate the premises no later than July 18. On July 17, Jones advised Weller that she was working on moving out. She asked Weller not to file an eviction action and continually assured him that she would vacate within days. Over the next couple of weeks, Jones repeatedly provided a new date upon which she would be out of the apartment. In a text message sent on August 10, Jones advised that the keys would be left in the mailbox by 7:00 that evening. She did not, however, leave the keys that day.

{¶ 4} On August 12, Weller went into the apartment and found it full of Jones's belongings but in disarray. He turned down the thermostat and turned on the lights. Apparently believing that Jones had abandoned her property, Weller arranged for a company to remove her items and clean the apartment. When he returned on August

14 with the contractor, the apartment was in the same condition; there was no indication that Jones had returned. The apartment was cleaned over two days, and most of the items were taken to the county trash facility.

{¶ 5} Jones contacted Weller on August 15, asking why people had been inside her apartment and saying that she still needed to get her items out of the apartment and to clean it. Weller responded that "[s]ince you vacated the apartment and told us everything would be done Sunday, anything that was left was presumed forfeited and has probably been disposed of. * * *" Jones asked for an opportunity to get her remaining belongings, but Weller refused to allow her back into the property. Jones later saw that some of her belongings were shown in photographs listing the apartment for rent.

{¶ 6} Ten days later, on August 25, 2023, Weller was charged by complaint with theft, criminal damaging, and criminal trespass. The case proceeded to a bench trial on October 19, 2023, during which each side presented three witnesses. The trial court sustained a Crim.R. 29 motion as to the criminal damaging charge and later found Weller not guilty of criminal trespass. As for the theft charge, the primary issues at trial were whether Jones had vacated the apartment, leaving her personal property behind, or, at a minimum, whether Weller possessed a reasonable belief that she had done so. After considering the evidence, the trial court found Weller guilty of theft. It imposed and suspended a 30-day jail sentence and ordered Weller to pay a $300 fine plus court costs. The trial court stayed the sentence pending appeal.

{¶ 7} Weller appeals from his conviction raising two assignments of error. His first assignment of error claims that the trial court erred in finding him guilty of theft because

theft of abandoned property is legally impossible. His second assignment of error claims that the trial court erred in finding him guilty of theft because he acted under the reasonable belief that the relevant property had been abandoned.

**{¶ 8}** In his assignments of error, Weller states that the court erred "as a matter of law" in finding him guilty of theft. As phrased, Weller appears to contend that his conviction was based on insufficient evidence. His argument, however, is based on his affirmative defense of abandonment and relies substantially on his own evidence in support of that defense, which implies a manifest-weight argument. The State's brief, in response, contends that Weller's conviction was neither based on insufficient evidence nor against the manifest weight of the evidence. Weller's counsel confirmed at oral argument that he was raising both the sufficiency and the manifest weight of the evidence, and the State agreed that both were applicable. We therefore construe Weller's appellate brief as challenging his conviction on both grounds.

## II. Relevant Legal Standards

**{¶ 9}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal

unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 10} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 11} The trial court convicted Weller of theft in violation of R.C. 2913.02(A)(1), which provides: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either property or services * * * [w]ithout the consent of the owner[.]" "Deprive" means to do any of the following:

(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;

(2) Dispose of property so as to make it unlikely that the owner will recover

it;

(3) Accept, use, or appropriate money, property, or services, with purpose
not to give proper consideration in return for the money, property, or
services, and without reasonable justification or excuse for not giving proper
consideration.

R.C. 2913.01(C).

{¶ 12} "A person acts purposely when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). Thus, the theft statute obligated the State to prove that Weller acted "with a specific intent to deprive the owner of property." *State v. McNeill*, 2d Dist. Clark No. 2017-CA-64, 2018-Ohio-2659, ¶ 40. In addition, a conviction required "positive evidence, direct or circumstantial," that Weller knew someone else owned the property. *State v. Chessman*, 2d Dist. Montgomery No. 24451, 2012-Ohio-1427, ¶ 19.

### III. Evidence Presented at Trial and Trial Court's Ruling

{¶ 13} Jones testified as a prosecution witness at trial. On direct examination, she reviewed the communications between Weller and her regarding her late rental payments and her plans to vacate the apartment. Jones first indicated that she would be "working on moving out" on July 17, and over the next several days she asked for extensions of time and to not be evicted. On Monday, July 24, 2023, Jones emailed Weller that she would be "completely out this week" and that she would contact him when she was done to give him the keys. Two days later, she advised Weller that she "was able to get a storage unit for today" and would be "moving some stuff out." She indicated that she would be "completely finished no later than Saturday." On July 31, she wrote

that she still needed "to get some bigger items moved," which she could do the following evening, "and then some cleaning."

{¶ 14} As of Thursday, August 3, 2023, Jones still had not vacated the apartment. She informed Weller that she still needed "to get the bigger things and some trash and clothes out." She promised she would have "everything done by [S]unday. 100% forsure done on [S]unday." Jones asked Weller not to enter the apartment yet and said she would leave the keys. On Wednesday, August 9, 2023, in response to Weller's question about the location of the keys, Jones advised Weller that she had them and "still have things to do there." Weller responded that his attorneys had been instructed to file an eviction action the next day. He told Jones that he would check the apartment in the morning, and if it were empty and the keys were left, he would call the attorneys to cancel that instruction. On Thursday, August 10, 2023, Jones sent Weller the following text message: "I'm finally going to have help today. My friends are gonna help me clear the rest out and clean up. I took the day off work to get it all knocked out. The keys will be in the mailbox by 7 pm today." She added, "I also arranged to not have my kids to get it all wrapped up."

{¶ 15} The next exchange between the parties occurred five days later on the afternoon of Tuesday, August 15, 2023, when Jones sent Weller the following e-mail: "I'm not sure why people are in the apartment when I was not served an official 30 days' notice. I'd like to get the rest of my things and get it cleaned because it was an absolute disaster from allowing family to stay there while I was dealing with some health things and was not able to be there as I was in a facility[.]"

{¶ 16} Weller responded that a three-day notice had been served, that Jones had promised to be gone, that he had not heard anything else from her, and that the locks had been changed.   When she again inquired about her belongings, Weller responded: "Since you vacated the apartment and told us everything would be done Sunday, anything that was left was presumed forfeited and has probably been disposed of.   I'm sorry things are tough but we've been beyond patient and been promised multiple times that you'd be gone and those haven't been delivered on."   Jones replied that she would be at the apartment later that day to "get what I can."   Weller then told Jones: "There is nothing left.   It was cleaned out Monday since we received no communication."   He added that "[t]he third party contractors ha[ve] informed us remaining refuge [sic] was taken to the Miami County Transfer Station and Recycling Center."

{¶ 17} Jones testified that she had been at her apartment on Friday, August 11, 2023, and had spoken to the former property manager, Dale Thompson, while she was there.   According to Jones, Thompson entered her apartment and discussed "the situation" with her.   Jones also viewed earlier videos of her apartment taken when she had lived there and identified items of property.   Jones then viewed an online rental listing for her apartment which had been created after her departure.   The listing included a picture of Weller and contact information for Urbana Tomorrow; the listing also included pictures of the apartment and showed a couch, a clock, wall art, décor, and curtains that had belonged to Jones.   She also identified a stove and refrigerator in the kitchen that she claimed to have purchased herself.   Jones testified that she did not give those items to Weller, his company, or the clean-out company.   She stated that she had been

surprised by the pictures in light of Weller's representation that all of her property had been removed and discarded.

{¶ 18} On cross-examination, Jones admitted lying to Weller in the text exchanges regarding her progress in vacating the apartment, being in a "facility," and having family members staying with her.   On re-direct examination, Jones testified that she never told Weller that she in fact had finished moving out.   Jones stated that she had removed only a few items and bags of clothes from the apartment when she left on August 11, 2023.  The rest of her possessions had remained there.

{¶ 19} The next prosecution witness was Dale Thompson, the former property manager.   He had managed the property for the previous owner but did not work for Weller.   Thompson testified that he spoke to Jones at her apartment on August 11, 2023, and told her about the eviction process.   In particular, he told Jones that a landlord was required to serve a three-day notice and then a 30-day notice before filing an eviction action in court.   He tried to "explain the facts" because she was worried about getting "thrown out" in a day or two.   He watched the same older videos of Jones's apartment that she had reviewed, identified her furnishings, and testified that the apartment looked similar to the videos on August 11, 2023.   He also corroborated Jones's testimony that she had supplied her own stove and refrigerator.   According to Thompson, it appeared as if Jones was living in the apartment on August 11, 2023.   In his opinion, it did not even appear as if she were moving out.

{¶ 20} The final prosecution witness was David Uhl.   He explained that he had been granted immunity from prosecution in exchange for his testimony.   Uhl testified that

Weller had spoken to him on August 12, 2023, about cleaning out Jones's apartment. Weller told Uhl that the tenant had moved out, and he hired Uhl's company to perform a clean out. Uhl and Weller met at the apartment on Monday, August 14, 2023. Uhl testified that Weller knocked on the door and received no response. Weller proceeded to unlock door, and the two men entered the apartment. It appeared to Uhl as if the apartment had been "abandoned." He stated that "[i]t looked as though the apartment had been ransacked and that anything of value that somebody would have wanted was already removed." He testified that the bathroom was "disgusting," that the kitchen smelled, and that he observed dirty dishes and rotten food. He saw mattresses and box springs in the bedrooms but no sheets or other bedding. He also recalled seeing a television left in the apartment. Uhl reviewed an older video from inside Jones's apartment when she had lived there. He testified that the condition of the apartment when he cleaned it out did not look anything like the video.

{¶ 21} Uhl explained that he and a crew of three or four men spent several hours on each of two days removing items from the apartment. He recalled taking a full trailer load and a partial trailer load of "stuff" to the dump. Uhl testified that his crew removed everything from the apartment except for a high-school diploma that they found. When then shown the interior photographs of the apartment from Weller's new rental listing, Uhl acknowledged that he may have left the clock, wall art, curtains, and other items depicted in the pictures. He also acknowledged that he did not remove the stove or refrigerator. Regarding the couch shown in the pictures, Uhl had no recollection of it either way.

{¶ 22} On cross-examination, Uhl confirmed that it did not appear to him as if

anyone was living in the apartment when he cleaned it out. He described its condition as "squalor." He again stated that it appeared as if someone had gone through the apartment and had taken what they wanted. He recalled seeing dirty clothes, spoiled food, and foul-smelling water in the sink. In Uhl's opinion, "[a] reasonable person would not have thought someone was living there." On re-direct examination, Uhl did not recall whether Weller had told him to keep the couch. When asked about the items that were left behind, Uhl described it as an "oversight." He had no other explanation for why the couch and other items were left behind. He also acknowledged that he had performed several other jobs for Weller. Following Uhl's testimony, the State rested its case.

{¶ 23} Defense counsel then called three witnesses. The first two were husband and wife Andy and Margaret Mitterholzer. Andy testified that he and his wife operated a woodworking shop in a space they leased from Weller directly below the apartment. He said that the shop's ceiling was not well insulated and that he typically would see or hear Jones because he worked long hours. Andy stated that he and Jones texted "probably once a week maybe," particularly when he was working late hours (to 2:00 or 3:00 a.m.), because of the noise caused by his machines. He explained that if he envisioned himself staying late, he would ask her if she had a problem with it. Andy stated that he felt "more personal with her only because [he] was constantly seeing her and [he] knew when she wasn't there." Andy indicated that, with the prior landlord, Jones had expressed to him a couple of times that she was not coming home because she was behind on her rent.

{¶ 24} On Saturday, August 12, 2023, Andy spoke to Weller, who had arrived to access the upstairs apartment. He advised Weller that he had not seen Jones or heard

her upstairs for a week to a week and a half. Andy explained that if he left the shop during business hours, his wife would be there. Andy was at his shop when Jones's apartment was being cleaned out. Although he did not see items being taken away, he "heard a lot of traveling up and down steps * * * and what sounded like heavy things being moved up and down the steps."

{¶ 25} For her part, Margaret testified that she also spoke to Weller on August 12, 2023. She testified that she told Weller that she had not seen Jones's car for a week or two and thought Jones was moving. Margaret stated that Jones usually parked her car in front of the woodworking shop, but she did not often see Jones in person. Margaret indicated that she had a full-time job elsewhere, and her husband talked with Jones more than she did. Andy and Margaret also both testified that they did not see the former property manager, Dale Thompson, on August 11, 2023.

{¶ 26} The last witness at trial was Weller. He testified about purchasing the building that housed the woodworking shop and the upstairs apartment and about his text exchanges with Jones throughout June regarding her delinquent rent payment. He also testified about Jones's failure to pay her July rent on time, his posting a three-day notice to vacate on Jones's door in mid-July, and the text exchanges that followed in July and August. After discussing the August 3 text in which Jones said she would be out by Sunday "100 percent," Weller was asked if he believed Jones was working on moving out. Weller responded, "I didn't have any reason to believe that she wasn't, other than she had not delivered on her previous promises." When Jones texted on August 9 that she still had things to do in the apartment, Weller agreed "this pretty much [was] the last

straw." He then referenced Jones's text message to him on August 10, 2023, in which she told him that she had taken the day off work and had secured help from friends to finish moving out that day. Weller testified that he gave Jones one last chance.

{¶ 27} Two days later, Saturday, August 12, 2023, was "Second Saturday," a notable event for downtown Urbana merchants. Weller stated that it was not uncommon for him to be downtown to check in on his various business tenants. Weller went to the building to check on the Mitterholzers and to see if Jones had moved out. He testified that he "assumed since [he] hadn't heard anything else, that the property would be empty by then."

{¶ 28} After speaking to the Mitterholzers, he knocked on the doors to the upper apartment and, after receiving no response, he entered. He described it as a "mess" with a distinct odor from molding food and stagnant water in the kitchen sink that looked like it had been left for several days. It appeared to him as if no one had been in the apartment for a while. It also appeared as if the contents of the apartment had been "rifled through" with things left for the "landlord to deal with." To make sure no one was using the apartment, Weller lowered the thermostat from 72 to 66 degrees and turned on three lights. He then left and returned with Uhl on Monday, August 14, 2023. Upon entering the apartment on that occasion, he found everything as he had left it two days earlier. The contents of the apartment were in the same place, the odor had gotten worse, three lights were on, and the thermostat remained at 66 degrees. In Weller's opinion, Jones had vacated the apartment and the contents had been abandoned. Weller discussed the matter with Uhl, who was with him, and Uhl agreed.

**{¶ 29}** Weller also viewed the videos of Jones's apartment that had been taken around Christmastime and other times when Jones lived there. He testified that it looked "completely different" when he entered in August. He reiterated that it appeared "as if somebody had taken whatever they deemed important to them and left the rest to be dealt with." On cross-examination, Weller acknowledged that Jones never mentioned abandoning any property. When asked why the couch and other items had been left in the apartment after the clean-out crew departed, Weller assumed that the artwork and some other items had been "missed." He explained that he had not expected the crew to remove the stove and refrigerator. He stated that he had not known those items belonged to Jones and had assumed that they came with the apartment when he purchased the building. As to the couch, Weller testified that he did not ask the clean-out crew to retain it. He acknowledged, however, that Jones's couch, artwork, and other items appeared in listing photographs for the apartment after her departure. When questioned about whether he ever asked Jones if he could keep the couch, artwork, and other items, Weller responded that he did not ask her about what he perceived to be abandoned property. He likewise did not ask her about keeping the stove and refrigerator because he did not know they were hers. On re-direct examination, Weller opined that Jones had relinquished any right to the items at issue by abandoning them. That being so, he insisted that he had not taken any property that belonged to Jones.

**{¶ 30}** In finding Weller guilty of theft, the trial court made the following findings:

> The tenant even though making numerous promises to leave and failing to follow through on the same, was clearly not leaving.

The Defendant clearly knew the proper procedure to be followed to legally regain the premises as he made numerous references to the same.

Defendant had given a three-day notice, posting the same, which displays to the Court he knew the proper procedure, and he had threaten[ed] the filing of legal eviction action.

The tenant's misrepresentation does not amount to any kind of legal defense for Defendant's actions.

Defendant's witnesses, downstairs tenant, also tenants of the Defendant, ran a business and were there only during business hours and their testimony as to the comings and goings of the victim/tenant is questionable.

Defendant's witness of the condition of the apartment and opinion that it was abandoned is questionable for numerous reasons.

The witness and the Defendant are in business together.

The witness testified that nothing in the apartment had any value and all things where [sic] removed and taken to the dump. This is clearly erroneous in that the witness could not account for the items in question that where [sic] retained by the Defendant and later used in the staging of the apartment for release, i.e. wall picture, refrigerator, couch, bathroom pictures, clock, etc.

These items left undeniably by the tenant had value that could and should have been immediately seen.

The Defendant made no attempt to contact the tenant as to those items he retained even though it can be clearly seen that the parties knew how to contact each other.

Further review of the time line shows that there was multiple contact between the parties.

Some of the contact happen[ed] after the retaking of the leasehold with no discussion by the Defendant of the items he retained.

It is clear from the testimony given that the tenant's representations could not [be] nor should have been relied on by the Defendant when he relied on his [s]elf [h]elp remedy of retaking possession of the apartment.

Therefore, the Court find[s] that the Defendant, a person with purpose to deprive the owner (tenant) did knowingly obtain and exert control over the property of the tenant without the consent of the tenant.

The Court find[s] Defendant Guilty of Theft.

December 12, 2023 Judgment Entry at 1-2.

## IV. Analysis

{¶ 31} Upon review of the evidence before the trial court, we conclude that there was sufficient evidence to support Weller's conviction for theft. Construing the evidence in the light most favorable to the State, the evidence established that Jones was renting an apartment from Urbana Tomorrow, Weller's company, and the two had numerous communications about Jones's tenancy. Jones's testimony, if believed, demonstrated that she owned the personal property in the rented upstairs apartment. The evidence

further reasonably showed that Weller acted with a purpose to deprive her of her property when he hired contractors to remove her items from the unit. In addition, her testimony supported a conclusion that Weller continued to exert control over her remaining property when he used it for promotional purposes and refused to allow her to retrieve it. Weller's claim that his conviction for theft was based on insufficient evidence is overruled.

{¶ 32} Whether Weller's conviction was against the manifest weight of the evidence presents a closer question. Weller raised the affirmative defense of abandonment. Under that defense, Weller could not be convicted of theft if Jones abandoned the property at issue or if he reasonably believed she had done so. *State v. Beyers*, 2d Dist. Greene No. 1995-CA-32, 1996 WL 200582, *3 (Apr. 26, 1996). We have distinguished these two concepts in *Beyers*, saying:

[W]e note the existence of two concepts that, while related, are different. One of these is the actual abandonment of property by the owner. The other is a defendant's belief that the property has been abandoned. Either is a defense to a charge of theft. If a defendant reasonably believes that the owner has abandoned the property, then the defendant cannot have the requisite intent to deprive the owner of his property. However, even if the defendant's purposes are purely larcenous, if, in fact, the owner has abandoned the property taken by the defendant, then the defendant cannot be guilty of theft. It would be the same as if the defendant, intending to steal his neighbor's television set, absconds with it only to discover that it is, in fact, his own television set that the neighbor had earlier borrowed from

the defendant's wife.

*Id.* at *3.

{¶ 33} "Abandoned property" includes property over which " 'the owner has relinquished all right, title, claim, and possession with the intention of not reclaiming it or resuming its ownership, possession or enjoyment.' " *Hamilton v. Noe*, 12th Dist. Butler No. CA 2008-08-182, 2009-Ohio-2802, ¶ 9, quoting *Doughman v. Long*, 42 Ohio App.3d 17, 21, 536 N.E.2d 394 (12th Dist.1987).   Vacancy or non-use, alone, does not establish abandonment.   *State v. Strait*, 5th Dist. Ashland No. 15-COA-043, 2016-Ohio-7200, ¶ 22.   Abandonment of property requires the owner's intent to abandon coupled with acts or omissions implementing that intent.   *Id.*   Under appropriate circumstances, an owner's intent to abandon property may be inferred.   *Beyers* at *3.

{¶ 34} On appeal, Weller contends Jones's testimony that she in fact had not abandoned the property in the apartment was not conclusive regarding her intent. Weller insists that he "was not required to show that Jones personally understood herself to have abandoned the property in question."   Appellant's Brief at 10.   Rather, he maintains that he only was required "to establish proof of intent to abandon, which can be inferred from Jones's acts and surrounding circumstances, coupled with acts or omissions implementing that intent."   *Id.*   In contrast to Jones's testimony, Weller cites circumstantial evidence of her intent to abandon the property, including (1) Jones's statement that she would be out of the apartment by the end of the day on August 10, 2023, (2) the Mitterholzers' act of advising Weller that they had not seen or heard from Jones for some time, (3) the condition of the apartment when Weller entered it, (4) the

apartment being in the same condition two days later when he reentered it, and (5) David Uhl's opinion that the contents of the apartment appeared to have been abandoned.

{¶ 35} Jones's unequivocal testimony on the abandonment issue was strong evidence that she lacked an actual intent to abandon the property in the apartment. The trial court credited that testimony. We note too that the record contains no evidence of Jones's leaving her key behind, as she told Weller she would do when vacating the apartment for the final time. Jones's lack of actual intent to abandon her property was further supported by her immediate reaction when driving past the apartment on Tuesday, August 15, 2023. She contacted Weller, asking him why people were in the apartment and expressing a desire to retrieve her possessions.

{¶ 36} As for Weller's countervailing circumstantial evidence, we believe it more properly goes to the reasonableness of his belief that Jones had abandoned the contents of the apartment, which we will discuss later. Nevertheless, we cannot conclude that the weight of the circumstantial evidence established that Jones intended to abandon her belongings. Although Jones apparently had not been in the apartment between August 12 and August 15 and the apartment looked like an "absolute disaster" when Weller entered, Jones's short-term non-use of her apartment, without more, did not establish that she had abandoned her property.

{¶ 37} We therefore turn to whether Weller acted under a reasonable but mistaken belief that Jones had abandoned her possessions. Upon review of the entire trial, we conclude that the weight of the evidence supported that he did. Weller had several text exchanges with Jones in which Jones assured Weller that she was arranging to move out

of the apartment. On Thursday, August 10, 2023, Jones wrote to Weller that she had taken the day off, that her friends were going to help her "clear the rest out and clean up," and that the keys would be in the mailbox that evening. Based on Jones's repeated prior failures to follow through, we agree with the trial court that Weller could not have reasonably believed, based on Jones's August 10 representations alone, that she would be moved out by the end of that day.

{¶ 38} However, Weller made further efforts to ascertain whether Jones had moved out. On August 12, he spoke to the Mitterholzers about Jones's presence at the apartment and the condition of the upstairs apartment. Contrary to the trial court's factual finding, the record reflects that Andy Mitterholzer was at his business beyond business hours and often late into the night. He usually saw or heard Jones and regularly communicated with her to discuss his late hours. Moreover, both Andy and Margaret were familiar with Jones's vehicle. They informed Weller that they had not seen Jones or heard her upstairs for a week to a week and a half. They also indicated that they understood Jones was moving out.

{¶ 39} Weller also entered Jones's apartment to confirm whether Jones continued to reside there. Even if we discount much of the testimony from his witnesses, as the trial court did, Jones herself admitted in her final e-mail exchange with Weller that she had left the apartment an "absolute disaster" inside. Weller employed Uhl's crew to clean out the apartment and almost all the items were taken to the dump, which further supported that Weller reasonably believed that Jones had taken what she wanted and abandoned the rest. Weller also provided uncontroverted testimony about turning down

the thermostat and turning on three lights on Saturday, August 12, 2023, and finding the apartment in the same condition on Monday, August 14, 2023, suggesting that Jones had spent little or no time there in the interim. Given Jones's representation that she would leave, the condition inside the apartment, and the information Weller possessed indicating that Jones had left, Weller reasonably inferred that Jones's possessions had been abandoned when he met Uhl on Monday, August 14, 2023, to have the clean out started. It seems unlikely that Weller would steal Jones's property only to hire Uhl to transport the stolen items directly to the dump.

{¶ 40} It is undisputed that Weller retained possession of several items from Jones's apartment after she e-mailed him on Tuesday, August 15, 2023, and made clear that she wanted to retrieve her belongings. These items included her stove and refrigerator, a couch, a clock, wall art, décor, and curtains. Weller claimed that he did not know Jones had purchased her own stove and refrigerator, and we find no evidence that Weller had either the requisite intent or knowledge of another's ownership for the theft of those items.

{¶ 41} As for the items shown in the listing photos, Jones contacted Weller on August 15, demanding to retrieve her belongings. Weller falsely responded: "There is nothing left. It was cleaned out Monday since we received no communication." He added that "[t]he third party contractors ha[ve] informed us remaining refuge [sic] was taken to the Miami County Transfer Station and Recycling Center." Weller may have lacked first-hand knowledge and may have believed this representation was true when he made it. Indeed, Uhl testified that his employees cleaned the apartment, and he

himself appeared to lack first-hand knowledge of what became of all of Jones's belongings. However, Weller certainly was aware of the remaining items when he listed the apartment for rent and staged the listing with pictures of Jones's couch and assorted other items that belonged to her. Weller asserted that he believed the items were his because they had been abandoned.

{¶ 42} Although Jones's items had not been abandoned, the weight of the evidence demonstrated that Weller did not know that Jones continued to own the property to support a theft charge. Once Weller reasonably believed that Jones had left the apartment and abandoned the remaining items, Weller also reasonably believed that he could discard or use the items as he saw fit. It also follows that he reasonably believed that Jones had no right to the return of the property, even if she asked for it. While Jones asked for a chance to retrieve her items, his responses to her demonstrated that he did not know the items were hers and, instead, believed they were his.

{¶ 43} In summary, upon review of the entire trial, we conclude that Weller's conviction for theft was against the manifest weight of the evidence. Although the evidence established that Jones had not abandoned her belongings, the manifest weight of the evidence demonstrated that Weller acted with a reasonable, albeit mistaken, belief that Jones's personal property had been abandoned. Weller's first assignment of error based on actual abandonment is overruled. His second assignment of error based on his reasonable belief is sustained.

{¶ 44} Our conclusion notwithstanding, we emphasize that "self-help" eviction of residential tenants is unlawful in Ohio. *See* R.C. 5321.15. However, we state no

opinion on whether Weller or Urbana Tomorrow should face civil consequences, either statutory or under common law, for Weller's actions in this case. Rather, we simply conclude here that the manifest weight of the evidence did not support the criminal offense of theft.

## V. Conclusion

**{¶ 45}** The trial court's judgment will be reversed.

. . . . . . . . . . . . .


WELBAUM, J. and LEWIS, J., concur.