[Cite as *State v. Teater*, 2019-Ohio-143.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27753 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-4016 |
| | : | |
| DANIEL TEATER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 18th day of January, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

STEPHEN P. HARDWICK, Atty. Reg. No. 0062932, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Defendant Daniel Teater appeals his conviction for felonious assault. He alleges that the trial court erred by limiting his cross-examination of a prosecution witness. We find no error, and we affirm.

## I. Facts and Procedural History

{¶ 2} Teater was indicted in January 2017, on one count of felonious assault (serious harm), in violation of R.C. 2903.11(A)(1), after he inflicted life-threatening injuries on Brian Caldwell. Teater claimed self-defense and testified in support of his defense. The evidence presented to a jury established the following facts.

{¶ 3} In December 2016, Caldwell, Teater, David Bendig, and some others, were renovating an empty residence in Dayton owned by Javon House. The renovations apparently had been going on for some time. Bendig testified that he had been working on the house for eight or nine months. It seems that House often hired people with drug problems and paid them in cash and drugs. Teater admitted that he was addicted to opiates and said that House gave him drugs every day. Bendig too testified that House sometimes paid him with drugs. Caldwell lived in the house at the time and kept an eye on things. He also oversaw the renovations. By all accounts, Caldwell was a demanding boss and was often not pleasant to work with.

{¶ 4} Around 1:30 p.m. on Friday, December 23, Teater showed up to work. Only Caldwell was at the house. At some point that afternoon, Teater and Caldwell had a fight in the pool room (that is, the room with the pool table). According to Teater, Caldwell attacked him, doing some kind of choke move. Teater said that he was able to get away and grab a heavy object that he believed was a chair leg. Teater used the object to hit

Caldwell in the head. Teater claimed that after he hit Caldwell once, he ran out of the house. There were no tools found in the pool room, and the only furniture was the pool table.

{¶ 5} House stopped at the property that night and found Caldwell lying on the floor of the pool room. House saw injuries on Caldwell's face and smelled alcohol on him, so he assumed that Caldwell had been in a fight and was drunk and sleeping it off. House then called Bendig, who came over. He too thought that Caldwell was drunk and just sleeping it off. The next day, Saturday, House returned to the property expecting Teater. Teater never showed up. Caldwell was still lying on the floor. House assumed that he was still hung over. Bendig came over and thought that Caldwell's condition appeared about the same. On Sunday, Caldwell was still lying on the floor. Because he had not improved, House, Bendig, and a third man carried him out of the house, put him in Bendig's truck, and drove him to the hospital. House left his name and phone number and Caldwell's name, but House lied and said that they had found Caldwell in an alley. House said that he lied to protect Teater. House explained that Teater was a good worker who always showed up, so when he did not show up for work on Saturday, House suspected that Teater and Caldwell had gotten into a fight.

{¶ 6} Because Caldwell's injuries were so severe, the hospital contacted the police. That night, police brought Bendig and House in for questioning. House quickly told the interviewing detective all he knew. During the interview, the detective had House make a recorded phone call to Teater and ask him what had happened. Teater initially said that he walked in on Caldwell and a guy named "Tony" "doing something they weren't supposed to" and that Caldwell came at him and choked him. (Tr. 359). Teater said that

he hit Caldwell in the head with a pipe. He said that when he left the house, he did not know if Caldwell was alive.

{¶ 7} A couple days later, Teater was brought in for questioning. He admitted to the detective that there was no Tony, "that he had made that up because he was hoping to throw Javon [House] off and maybe make him think that Tony had done it." (*Id.* at 372). Teater said that when he arrived at the house, Caldwell immediately "started picking on him." (*Id.* at 370). Caldwell then attacked him and choked him twice. The second time, Teater said that he grabbed an object, possibly an old table leg, and hit Caldwell twice. Teater then left. Teater's testimony at trial was similar. He said that Caldwell blocked his first swing but that his second swing connected with Caldwell's head.

{¶ 8} Because Teater asserted self-defense, evidence of his and Caldwell's size was presented. Teater testified that he was six-foot-one and, at that time, about 134 pounds. However, a detective testified that when Teater was booked into jail he was listed as 160 pounds. (Tr. 546) As for Caldwell, the evidence showed that he stood about five-foot-eight. But the evidence of Caldwell's weight varied widely. House testified that he and Caldwell were "about the same size" and that he (House) weighed 240 pounds. (Tr. 211). House said that Caldwell was "way stronger" (*Id.* at 210) and "way more physically fit" (*Id.* at 211). Teater testified that Caldwell was twice his size, "[s]olid muscle," probably weighing 230 or 240 pounds. (*Id.* at 503). But Bendig estimated Caldwell's weight at only 170 pounds. (*Id.* 250). He agreed that Caldwell was physically fit but denied that he could have weighed 230 or 240 pounds. (*Id.* 253). A police officer testified that, according to jail records from six months before the fight, Caldwell reported that he weighed 165 pounds. Lastly, hospital records from two days after the assault listed Caldwell's weight as a little

over 148 pounds.

{¶ 9} Teater inflicted life-threatening injuries on Caldwell, breaking bones in almost every part of his head,[1] according to a treating physician. No injuries were found anywhere else on Caldwell's body. A physician testified that it was unlikely that one blow to the head would have caused so much damage. Indeed, according to the physician, given the amount of damage, Caldwell was likely hit several times with a blunt object. In stark contrast, Teater had no visible injuries and did not claim that he had been injured in the fight.

{¶ 10} The jury rejected Teater's claim of self-defense and found him guilty. The trial court sentenced him to six years in prison.

{¶ 11} Teater filed a request to file a delayed appeal, which we granted.

## II. Analysis

{¶ 12} The sole assignment of error alleges:

The Trial Court erred by limiting the opportunity to cross-examine a prosecution witness on his ability to perceive and remember facts accurately.

{¶ 13} On cross examination, defense counsel directed Bendig's attention to the night he was interviewed by police, about two days after the assault. Defense counsel asked Bendig whether he was "dope sick" on that night. Bendig answered, "No." (Tr. 239).

---

[1] After Caldwell was brought to the hospital, he was transferred to a trauma center because his injuries were so serious. Caldwell could not feed himself or swallow and eventually received a feeding tube. After being discharged from the hospital, Caldwell was transferred to a rehabilitation center. At that time, he could not dress himself or make day-to-day decisions. In March 2017, Caldwell's mental ability remained severely diminished, and he had no concept of reality.

The trial court overruled the state's objection. Then defense counsel asked, "Back when this happened were you—back in December were you using drugs?" (*Id.* at 240). The state again objected, and the trial court called a sidebar.

The state: "Your Honor, there's no relevant testimony that he's using drugs. There's nothing to go into as far as—well, his ability to (indiscernible) that kind of thing. Whether or not he was under the influence at the time it has no relevance as to what happened on December 23rd, 2016."

Trial court: "Response?"

[Defense] Counsel: "During his interview he was dope sick, he fell asleep when the cops left. He fell asleep once the officer left the room. He kept falling over. He said he was dope sick, and—"

The state: "But what's the relevance of that?"

Counsel: "Because I don't think he's going to testify to the same things he said today that he did that day."

Trial court: "Well, he surely can go into the substance of his proper statement. If he said anything inconsistent with what he is now saying on the witness stand, of course, you can go into the substance of it. Was there—is there a specific inconsistency that you're attempting to establish on cross?"

Counsel: "I don't know yet."

Trial court: "Well, I mean, if you can, then it's relevant to go into the prior statement, but I'm not hearing * * * the relevance, and the fact that when he was interviewed he happened to be dope sick. But again, if he,

within that statement he made something that's inconsistent with what he's now saying, that's traditional impeachment.

(Tr. 240-241). For the remainder of Bendig's testimony, defense counsel said nothing more about Bendig's drug use, being under the influence of drugs, or being "dope sick."

{¶ 14} The trial transcript reveals that Teater did not preserve the assigned error on the grounds that he argues on appeal. Here, Teater argues that the trial court should have permitted inquiry into Bendig's drug use because counsel could have elicited testimony that impeached Bendig's testimony about Caldwell's weight based on "[a] defect of * * * ability * * * to observe, remember, or relate," Evid.R. 616(B). But defense counsel did not say anything about the relevance of Bendig's testimony on Caldwell's weight or size at the sidebar. In fact, Bendig was not even asked about Caldwell's weight on direct or cross-examination. On re-direct, the State first asked Bendig about Caldwell's height and weight. Defense counsel then inquired about Caldwell's size on re-cross. It is clear that defense counsel did not say anything about wanting to show a defect in Bendig's ability to observe Caldwell's height or weight at the time of the sidebar relating to whether Bendig was gererally using drugs in December. Counsel said only that inquiry was relevant because Bendig's testimony at trial might be different than what he said at the police interview. Counsel's explanation and the trial court's comments suggest that counsel sought to impeach Bendig's credibility by self-contradiction. *See* Evid.R. 616(C). Bendig's drug use does not seem relevant to this type of self-contradiction. An argument could be made that counsel was intending to impeach Bendig's credibility by showing a defect in his ability to observe Caldwell's size. Regardless, that is not how the trial court understood counsel's argument. The court plainly was not directed to potential

impeachment based on a sensory defect under Evid.R. 616(B), and the questioning about height or weight was not raised at that time.

{¶ 15} In essence, because Teater did not make this contention in the trial court, he is raising this issue for the first time on appeal, which he may not do. He has forfeited all but plain error as to the issue he raises here. *Compare State v. Hodge*, 2d Dist. Montgomery No. 7315, 1982 WL 3731, *4 (May 5, 1982) (refusing to consider appellant's argument that impeachment of his testimony violated his due-process rights, because that was not the ground given for objection at trial and appellant was raising the argument for the first time on appeal); *State v. Knott*, 4th Dist. Athens No. 03CA30, 2004-Ohio-5745, ¶ 9 (holding that "[b]ecause counsel's objection did not apprise the [trial] court of this specific argument, we believe a plain error analysis of the issue is appropriate"). Because Teater does not argue plain error here, we need not consider it. *See State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 17-20 (appellate court need not consider plain error where appellant fails to timely raise plain-error claim). However, even if we were to consider plain error, Teater has not established it. To prevail on a claim of plain error, Teater must show that the trial court plainly erred by limiting cross-examination and that but for the error the outcome of the trial clearly would have been otherwise. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69.

{¶ 16} We believe that the trial court's limitation was reasonable at the time that the objection was made, defense counsel never revisited the issue when Bendig's perception of height or weight was later introduced, and even if it had been readdressed, the trial court would not have abused its discretion under Evid. R. 403(A) by excluding a

generalized reference to use of drugs. Even if the evidence were admissible, on this record, the jury still would have rejected Teater's self-defense claim.

{¶ 17} Cross-examination is "permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B). Still, the " 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.' " *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993), quoting *Alford v. United States*, 282 U.S. 687, 691, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931). Teater argues that inquiry into Bendig's drug use would have elicited testimony that strengthened his claim of self-defense, specifically, the affirmative defense's second element, which requires the defendant to prove that he had "a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [the] only means of escape was the use of force." *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997). The test for self-defense is "a combined subjective and objective test." *Id.* at 330. There must be reasonable grounds (objective) for the defendant's belief that he was in imminent danger (subjective).

{¶ 18} Teater claimed that he believed that he was in imminent danger of harm from Caldwell. Assuming that the jury believed him, Teater also had to prove that this subjective belief was objectively reasonable. At that point in the trial, House had testified that Caldwell weighed 240 pounds, and Bendig had testified that Caldwell weighed only 170 pounds. Teater argues that asking Bendig about his drug use would have elicited testimony that called into question his testimony about Caldwell's weight, because Bendig's drug use during December affected his ability to perceive accurately Caldwell's weight. Teater's contention is that, if others perceived Caldwell as weighing 240 pounds,

then it was more reasonable for him to believe that Caldwell was going to hurt him. But Bendig's testimony on Caldwell's weight would not have been called into question even if he had used drugs in the month of the assault and the drug use affected his ability to perceive Caldwell's weight at that time. Bendig testified that he and Caldwell had both been working together for eight or nine months before the assault, so Bendig's perception of Caldwell's weight and size was based on many months of seeing Caldwell.

{¶ 19} Lastly, even if the trial court erred by limiting cross-examination, that error did not affect the outcome of the trial. There is no reasonable probability that permitting inquiry into Bendig's drug use would have led the jury to accept Teater's claim of self-defense. The credibility of Bendig's perception of Caldwell's weight was supported by his testimony that he had been working with Caldwell for several months. Furthermore, other evidence of Caldwell's weight undermined House's and Teater's testimony. A police officer testified that jail records from six months before the assault showed that Caldwell self-reported weighing 165 pounds, and hospital records listed Caldwell's weight two days after the assault as just over 148 pounds.

### III. Conclusion

{¶ 20} The sole assignment of error is overruled. The judgment of conviction is affirmed.

. . . . . . . . . . . .


TUCKER, J., concurs.

DONOVAN, J., concurring:

{¶ 21} I agree that the restriction of cross examination of Bendig did not affect the

outcome of this trial since Bendig was not an eyewitness to the felonious assault which led to Caldwell's injuries. Hence, Bendig was not in a position to support or undermine Teater's claim of self-defense. However, he was in other respects a critical witness for the State of Ohio. Thus, in my view, the trial court erred in limiting cross examination of Bendig regarding his drug use during the otherwise relevant time frames. Nevertheless on this record, the error did not prejudice Teater.

Copies sent to:

Mathias H. Heck
Heather N. Jans
Stephen P. Hardwick
Hon. Dennis J. Langer