[Cite as *State v. Petaway*, 2026-Ohio-1479.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| STATE OF OHIO | : |
| | :    C.A. No. 30424 |
|      Appellee | : |
| | :    Trial Court Case No. 2023 CR 02486 |
| v. | : |
| | :    (Criminal Appeal from Common Pleas |
| MASHHUD PETAWAY | :    Court) |
| | : |
|      Appellant | :    **FINAL JUDGMENT ENTRY &** |
| | :    **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 24, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, PRESIDING JUDGE

TUCKER, J., and HUFFMAN, J., concur.

JOHNNA M. SHIA, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-appellant Mashhud Petaway appeals from his conviction for felonious assault, following a jury trial in the Montgomery County Common Pleas Court. For the following reasons, we affirm the judgment of the trial court.

## I.    Facts and Procedural History

{¶ 2} On February 1, 2024, Petaway was indicted by a Montgomery County grand jury on one count of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1), a second-degree felony, and one count of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), a second-degree felony.   A three-year firearm specification was attached to each count in accordance with R.C. 2929.14 and 2941.145.

{¶ 3} Petaway filed a motion to suppress and supplemental motion to suppress challenging a pretrial identification made via photospread and a search warrant related to Petaway's cell phone.   Prior to the presentation of evidence at the hearing on the motions, Petaway withdrew his argument regarding the search warrant for the cell phone, and the hearing proceeded solely on the issue of pretrial identification.   The trial court overruled Petaway's motion.

{¶ 4} Petaway also filed a motion challenging the competency of D.L., the victim.   An in-camera interview was held.   After which, the trial court found D.L. competent.

{¶ 5} Both the defense and the prosecution filed pretrial motions in limine.   Petaway sought to exclude from the State's case-in-chief any evidence that he was on parole or had

2

any prior convictions.[1]   The State agreed that this evidence would not be admitted during the State's case-in-chief, but it could be admissible if Petaway were to testify at trial. Petaway further sought to exclude the testimony of his parole officer and the ammunition and extended magazines the parole officer recovered from Petaway's home.   The trial court directed that the parole officer could testify so long as he was not identified as Petaway's parole officer.   The ammunition and extended magazines were preliminarily ruled admissible provided that the proper foundations were laid.

{¶ 6} Petaway also sought exclusion of any testimony from D.L. regarding photographs depicting Petaway holding handguns, which were found on D.L.'s phone, as well as exclusion of the photographs.   During the hearing on the motions in limine, the State clarified that it intended to introduce the photographs of Petaway displaying handguns that were recovered from Petaway's phone, not D.L.'s phone.   Trial Tr. 32.   The trial court preliminarily ruled that the photographs would be admissible at trial subject to the proper foundation, and the issue could be reexamined at trial if an objection was raised.   *Id.* at 34-35.   Finally, Petaway sought to exclude any materials recovered from the Ohio Department of Rehabilitation and Corrections and a firearm recovered from Petaway's wife.   Neither of these issues was ruled on prior to trial.

{¶ 7} The State's motion in limine sought to exclude any statements made by D.L. to Dayton Police Dispatch regarding Detective Heiser.   The trial court reserved ruling on the issue.

{¶ 8} The case proceeded to a jury trial on February 18, 2025.   The victim, D.L., testified that he was 33 years old and moved to Dayton, Ohio, in 2011.   He met Petaway,

---

1. Petaway was on post-release control, not parole, at the time the offense was committed. Nevertheless, because the parties refer to it as parole, we use that terminology in this opinion for ease of discussion.

3

whom he knew as "B," while they worked together for a temp agency in early 2023. They worked together over the course of about three weeks and continued to spend time together for several weeks after leaving the job. D.L. and Petaway went out to eat together and drove around in Petaway's black Ford Focus. D.L. also went to Petaway's home a few times and met Petaway's wife.

{¶ 9} In the spring of 2023, D.L. and Petaway had a falling out and D.L. cut off all contact with Petaway. However, on May 9, 2023, around 1:00 a.m., Petaway showed up at D.L.'s house and knocked on the door, but D.L. did not answer. Petaway then called and left a voicemail on D.L.'s phone since D.L. refused to answer.

{¶ 10} On the evening of May 16, 2023, D.L. left his brother's home on Philadelphia Drive and went to catch a bus home to make dinner. D.L. had obtained his driver's license that day and drank a shot of vodka to celebrate, but he was not intoxicated. Although D.L. sometimes smoked marijuana, he denied smoking any marijuana that day due to him having to take his driver's test.

{¶ 11} While at the bus stop, D.L. saw Petaway and his wife drive past him twice in Petaway's black Ford Focus. D.L. testified that Petaway was the driver and was wearing a work uniform vest, with yellow and green on it, over a black hooded sweatshirt. Shortly thereafter, D.L. saw Petaway walking up Philadelphia Drive heading north from James H. McGee Boulevard. Petaway was wearing black jeans and had his hood up, but D.L. could see Petaway's face, which was unobscured. Petaway had a black 9 mm handgun in each hand. When Petaway was about five feet away from D.L., Petaway opened fire, saying, "[Y]ou know what time it is." Trial Tr. 182-183. D.L. believed that Petaway shot him with both guns.

4

{¶ 12} At the time of the shooting, it was still daylight. D.L. and Petaway were face-to-face when Petaway started shooting. After about five shots, D.L. turned away from Petaway to run. D.L. fell in the grass, and Petaway continued shooting at him. Petaway then ran south on Philadelphia Drive toward James H. McGee Boulevard in the direction of a drive-through store. D.L. was unable to call 911 on his phone because his phone was cracked and he could not unlock it. He stopped traffic in the middle of the street, and a woman called 911 for him.

{¶ 13} D.L. was struck by bullets in his left leg, right upper thigh, left arm, and head. At the time of trial, a bullet remained in his left leg, two bullet fragments in his head, and some fragments in his left arm. The parties stipulated that D.L. was treated at Miami Valley Hospital from May 16, 2023, to May 28, 2023. A copy of D.L.'s medical records were submitted, and the parties stipulated that D.L. suffered multiple gunshots to the upper extremities, lower extremities, abdomen, neck, and head, which caused traumatic perforation of the colon and small intestine, a traumatic injury of the stomach, a fracture to the right occipital bone, and a fracture to the skull. Additionally, one of D.L.'s kidneys was removed as a result of the gunshot wounds. At the time of trial, D.L. continued to suffer from migraines, numbness in his leg, infections, and difficulty using the restroom because of his injuries.

{¶ 14} D.L. spoke with the responding officers immediately after the shooting and told them that "B" shot him. He could not recall Petaway's full name but had Petaway's phone number and name saved in his cell phone. When police eventually provided D.L. with his cell phone, he was able to give them Petaway's information. He also picked Petaway out of a photospread with 100% certainty. D.L. identified Petaway during trial with 100% certainty.

{¶ 15} In February 2024, D.L., who was frustrated with the progression of the case, contacted a victim advocate and told her they had the wrong guy. It was not true, but he said it because he "wanted to take matters in [his] own hands and get revenge" on Petaway. Trial Tr. 191. However, D.L. decided not to do that because he had his own kids and did not want to go to prison. D.L. admitted that he had a prior misdemeanor theft conviction from 2020 or 2021.

{¶ 16} Dayton Police Officer Matthew Brown testified that on May 16, 2023, he was a patrol officer working on the west side of Dayton and was dispatched to Philadelphia Drive for a shooting. When he arrived on scene, D.L. was laying in the middle of Philadelphia Drive just south of Lexington Avenue with multiple gunshot wounds. D.L. was conscious and able to speak. Officer Brown requested a medic, who then transported D.L. to the hospital.

{¶ 17} Officer Brown's body camera captured a video of the scene as he arrived. It was still daylight but was getting progressively darker. Although D.L. said he had consumed alcohol, Officer Brown did not detect any odor of alcohol. D.L. was able to respond to the officer's questions, and the answers were coherent and consistent with the questions asked.

{¶ 18} Riverview Beverage was located south of Lexington Avenue on Philadelphia Drive. Officer Brown reviewed a surveillance video from Riverview Beverage that showed a man running from the direction of the shooting shortly after the shooting had occurred. The video showed a black male, wearing black pants and a dark grey long-sleeved shirt with a hood attached, running through the parking lot. The individual was turned sideways from the camera, so Officer Brown could not see the front of the man, only the side view as he

6

was running on the edge of the parking lot.   The officer did not recall seeing any bright colors on the man's shirt.

{¶ 19} Dayton Police Officer Shane Kaer testified that on May 16, 2023, he responded to the area of Philadelphia Drive as an evidence technician to photograph and collect evidence of a shooting.   Officer Kaer and his partner photographed and collected several items located at the crime scene, including the shooting victim's clothing, shoes, cell phone, and a liquor bottle.   Four spent Blazer Luger 9 mm casings and six spent MXT 9 mm casings were recovered from the scene.

{¶ 20} Dayton Police Detective Matthew Heiser testified that he was a detective in the Violent Offenders Unit on May 16, 2023.   He was assigned as the lead investigator for the shooting of D.L.   The day after the shooting, Detective Heiser attempted to get video from Riverview Beverage.   Although Detective Heiser was able to view the video, he could not obtain a copy due to technical issues with the surveillance system.   In reviewing the video, Detective Heiser observed a male figure running around Philadelphia Drive on the outskirts of the parking lot near West Riverview Avenue and then out of sight from the business shortly after the shooting.   He could not make out any identifying features of the person seen on the video.

{¶ 21} Detective Heiser waited until May 19, 2023, to speak with D.L. at the hospital because D.L. had been unconscious and intubated.   D.L. knew who the shooter was but did not recall his name.   After Detective Heiser obtained D.L.'s cell phone from the police property room, D.L. provided Detective Heiser with the name Mashhud Petaway as the shooter.   Detective Heiser then obtained an address for Petaway.   He went to Petaway's home on June 5, 2023, and obtained consent to search the home.   Ammunition and magazines for a firearm were discovered in the basement.   A box of .22 caliber ammunition

7

was recovered along with several magazines that fit into 9 mm firearms. Blazer Luger 9 mm and MXT 9 mm cartridges were also discovered in the basement. There was no visible dust on any of the items collected from the basement. While Detective Heiser was on scene, Petaway's wife pulled up in a black Ford Fusion. She had a SCCY 9 mm firearm on her person that was collected and tested, but it was not the gun that shot D.L.

{¶ 22} Petaway's cell phone was collected during the June 5, 2023 search, and Detective Heiser obtained a search warrant for the contents of the cell phone. However, when a Montgomery County Deputy Sheriff tried to access the contents of the phone, it overheated, so no information was recovered from it.

{¶ 23} Detective Heiser created a photospread using JusticeWeb, a computer software program, and had another detective administer the photospread to D.L. on June 5, 2023. D.L. circled photo number two on the photospread, which was a picture of Petaway.

{¶ 24} Officer Ryan Applegate was the State's last witness. He identified himself as an employee of the State of Ohio who worked in "a law enforcement capacity" and stated that he was familiar with Petaway through his employment. Officer Applegate testified that on June 5, 2023, he conducted a search of Petaway's residence and vehicle. He photographed Petaway's black Ford Fusion and turned it over to Detective Heiser. Officer Applegate located a firearm holster in the center console of Petaway's vehicle and firearm boxes and a firearm cleaning kit inside Petaway's home. There were six or seven empty firearm boxes located in the basement. No firearms were recovered from the home, but Petaway's wife had possession of a firearm on her person when she arrived on scene.

{¶ 25} Officer Applegate further testified that he obtained Petaway's cell phone and reviewed several images on it. The cell phone, an Apple iPhone 13, contained two photographs of Petaway with handguns. The first photograph was taken on the phone itself

8

on May 11, 2023, depicting Petaway holding a black semiautomatic firearm. State's Ex. 24. Petaway stated that he had been either cleaning or working on the gun that was depicted in the photograph. A second photograph depicted Petaway holding two semiautomatic firearms while seated in a vehicle. State's Ex. 25. One of the guns had an extended magazine with multiple rounds inside. Officer Applegate could not recall the date the photograph was taken. Officer Applegate stated he did not know what happened on Philadelphia Drive on May 16, 2023, and he was not involved in that investigation.

{¶ 26} Patrick McLaughlin, a firearms examiner for the Miami Valley Regional Crime Laboratory, testified on behalf of the defense as an expert in the field of firearms examination. McLaughlin asserted that a 9 mm firearm is a very common semiautomatic weapon that fires 9 mm caliber ammunition. He explained that a semiautomatic weapon is usually loaded using a magazine. Once a round is chambered and the trigger is pulled, the spent casing is extracted, and the gun automatically reloads itself and is ready to fire again. The caliber size designates the diameter of the bullet. Thus, a 9 mm firearm could fire any 9 mm cartridge, regardless of the brand, but could not fire a .22 caliber cartridge because of the size difference.

{¶ 27} McLaughlin explained that hundreds of manufacturers make 9 mm ammunition. When ammunition is made in the factory, the ammunition is made in batches of about 10,000 cartridges a day. There are no serial numbers on the cartridges themselves, but there are batch numbers on the boxes in which the ammunition is placed at the factory. Markings on the cartridges usually identify the brand and the caliber size. McLaughlin was unsure what the "20" imprint signified on the head of the MXT casings but surmised that it could be the year it was made or a factory number or batch number. Based

on his review of MXT ammunition, the number "20" imprint was not something found on all MXT cartridges.

{¶ 28} McLaughlin testified that in his opinion, the 10 casings recovered from the shooting, which included 4 Blazer Luger brand casings and 6 MXT brand casings, were all fired from the same firearm. All the MXT brand casings included a "20" imprint on the head of the casings. The 9 mm ammunition recovered from Petaway's basement included 20 Blazer Luger brand cartridges and 2 MXT brand cartridges, which also included a "20" imprint on the head of the casings. McLaughlin stated that the Blazer Luger and MXT brand ammunition recovered from Petaway's home were the same size and brand as the casings recovered from the shooting, but he could not directly connect the ammunition in the basement to the recovered casings.

{¶ 29} Following the completion of trial, Petaway was found guilty as charged. At sentencing, the trial court merged the two offenses and the State elected to proceed with sentencing on the charge of felonious assault (serious physical harm). The trial court sentenced Petaway to a mandatory indefinite prison sentence of a minimum of 8 years in prison to a maximum of 12 years in prison in accordance with Reagan Tokes Law. The trial court imposed a mandatory prison term of 3 years for each of the firearm specifications, which were ordered to be served consecutively to each other and prior to and consecutive to the underlying offense.

{¶ 30} Petaway filed a timely notice of appeal.

## II. Motion to Suppress

{¶ 31} Petaway's first assignment of error states:

The trial court erred when it overruled Petaway's motion to suppress.

**{¶ 32}** "When a witness has been confronted with a suspect before trial, due process requires a court to suppress the witness's identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under the totality of the circumstances." (Emphasis in original.) *State v. Beckham*, 2003-Ohio-3837, ¶ 10 (2d Dist.), citing *State v. Murphy*, 91 Ohio St.3d 516, 534 (2001). The defendant must first show that the identification procedure was unduly suggestive. "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." *State v. Adams*, 2015-Ohio-3954, ¶ 208, citing *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001). "If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required." *State v. Harmon*, 2017-Ohio-8106, ¶ 19 (2d Dist.), citing *Adams* at ¶ 209, and *State v. Williams*, 2015-Ohio-1403, ¶ 13 (2d Dist.).

**{¶ 33}** If the defendant shows that the pretrial identification procedure was unfairly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedure. *Id*. In making this determination, "[t]he factors to consider are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *State v. Broom*, 40 Ohio St.3d 277, 284 (1988), citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Reliability of the pretrial identification is the "linchpin" in determining the admissibility of such evidence. *Manson* at 114.

11

{¶ 34} "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. White*, 1994 WL 43095, *2 (2d Dist. Feb. 2, 1994), citing *Neil v. Biggers*, 409 U.S. 188 (1972). The defendant "bears the burden of showing that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances." *State v. Sherls*, 2002 WL 254144, *2 (2d Dist. Feb. 22, 2002), quoting *Biggers* at 199.

{¶ 35} We review a trial court's refusal to suppress pretrial identification under an abuse of discretion standard. *State v. Broadnax*, 2007-Ohio-6584, ¶ 25. "'Abuse of discretion' suggests unreasonableness, arbitrariness, or unconscionability." *State v. Grate*, 2020-Ohio-5584, ¶ 187, citing *Calderon v. Sharkey*, 70 Ohio St.2d 218, 222 (1982).

### A. Evidence at the Suppression Hearing

{¶ 36} The State presented two witnesses at the suppression hearing: Dayton Police Detectives Rod Roberts and Matthew Heiser. A color photocopy of the photospread administered to D.L. was admitted as an exhibit.

{¶ 37} Detective Roberts testified that he had been in law enforcement for over 20 years and had been a detective for 14 years. He was asked by Detective Heiser to administer a photospread to D.L. Detective Roberts was not involved in the investigation of the shooting and did not know the identity of the suspect. Detective Heiser provided Detective Roberts with a photo spread that Detective Roberts then showed to D.L. Detective Roberts and D.L. were alone in a conference room of the Dayton Police Department safety building at the time the photospread was shown. On the front page of the photospread, Detective Roberts wrote the date and time, as well as the location of where it was administered. He signed his name and read the instructions for the photospread out

12

loud and verbatim to D.L. Detective Roberts placed the photospread pictures in front of D.L. The detective documented that D.L. pointed to photo number 2 and said, "[S]hot me nine times." MTS Tr. 15. D.L. then circled and initialed the photo.

**{¶ 38}** Detective Heiser testified that he had been with the Dayton Police Department for over 20 years and had been a detective for 9 years. He had been assigned to investigate an incident in which D.L. was shot. Detective Heiser used JusticeWeb, a computer software program that contained photographs of individuals, to create a photospread. At the time he created the photospread, Detective Heiser had learned that Petaway was a potential suspect. After locating Petaway's photograph, Detective Heiser used the lineup feature of the program to randomly find photographs of other men of similar age, weight, hair, and complexion as Petaway. Once the photographs were provided, Detective Heiser made additional efforts to select five people that appeared similar to Petaway to ensure a reliable identification. The photographs Detective Heiser selected all included African-American males with short haircuts wearing blue jail uniforms. Although Detective Heiser selected the six photographs (one of which was Petaway), JusticeWeb selected the order in which the photographs were organized on the photospread.

**{¶ 39}** Detective Heiser acknowledged that the individual in position number four on the photospread wore a white t-shirt underneath the blue uniform, unlike the other people in the photospread. Furthermore, he acknowledged that the shading for the individual in position number one on the photospread made it difficult to determine whether there was any facial hair on his chin, while the other individuals all had facial hair. He explained that the exhibit was a color copy of the original, which made the coloring a bit "fuzzier."

**{¶ 40}** Detective Heiser requested Detective Roberts to assist in administering the photospread because he had not been involved in the investigation. Detective Heiser was

13

not in the room when the photospread was shown to D.L., and he did not disclose any information about Petaway's identity to Detective Roberts.

### B. Analysis

{¶ 41} According to Petaway, the trial court abused its discretion when it overruled his motion to suppress D.L.'s identification of him from the photospread line-up created by Detective Heiser. Petaway does not argue that the manner in which the photos were presented to D.L. was unduly suggestive. Instead, Petaway contends that the manner in which Detective Heiser selected the photographs was unduly suggestive because the photospread did not include photographs of individuals that appeared sufficiently similar to Petaway. We disagree.

{¶ 42} The record establishes that Detective Heiser created a random photospread consisting of six photographs, one of which was Petaway. Detective Heiser used the computer program JusticeWeb, in which he entered Petaway's identifying information, and the program located Petaway's photograph. The program then generated a compilation of similar photographs based on Petaway's known information. Detective Heiser stated that he personally selected five photographs from those compiled by JusticeWeb that appeared like and similar to Petaway's photograph. The photographs all depicted African-American males around the same age and weight, with short black hair, and wearing blue jail shirts. All the subjects of the photographs were posed against similar gray backgrounds. The computer randomly arranged the photos and placed Petaway's photo in the number two position.

{¶ 43} Upon review of the record, we cannot conclude that the photospread is unduly suggestive of Petaway's guilt. "[A] computerized method of creating photospreads avoids most potential unfairness and almost any claim that the lineup was suggestive." *State v.*

14

*Parrish*, 2006-Ohio-4161, ¶ 18 (2d Dist.), citing *State v. Carter*, 2006-Ohio-2823, ¶ 34 (2d Dist.). While there may be some differences in skin tones and the "fuzziness" in photograph number one made it difficult to distinguish whether that man had facial hair on his chin, neither issue caused the photospread to be unduly suggestive. The instructions for viewing the photospread that Detective Roberts read to D.L. indicated that the photographs may not always depict the true complexion of a person, that the perpetrator's image may not be among the photographs, and that hair styles, beards, and moustaches may easily be changed. Further, although the individual in position number four wore a white t-shirt underneath his blue shirt, unlike the other photographs, it was not unduly suggestive, particularly considering that photograph number four was not Petaway. Notably, "[a] defendant in a lineup need not be surrounded by people nearly identical in appearance." *State v. Davis*, 76 Ohio St.3d 107, 112 (1996), citing *New York v. Chipp*, 75 N.Y.2d 327, 336 (1990). Petaway identifies nothing about his own photograph that he suggests caused it to stand out.

{¶ 44} Finally, we have reviewed the color photospread used to identify Petaway, and we agree with the trial court that the six individuals selected for the photospread were similar enough not to be unduly suggestive. Consequently, we conclude that the trial court did not abuse its discretion in overruling Petaway's motion to suppress.

{¶ 45} Petaway's first assignment of error is overruled.

### III. Admission of Evidence

{¶ 46} Petaway's second assignment of error states:

The trial court abused its discretion when it permitted inadmissible, prejudicial evidence to be presented to the jury.

{¶ 47} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). "We will not disturb a trial court's evidentiary rulings unless we find 'an abuse of discretion that has created material prejudice.'" *State v. Johnson*, 2015-Ohio-4903, ¶ 53, quoting *State v. Noling*, 2002-Ohio-7044, ¶ 43.

{¶ 48} "When engaging in this gatekeeper capacity, the trial court must determine if potential evidence is relevant." *State v. Sutherland*, 2021-Ohio-2433, ¶ 24 (2d Dist.). Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible whereas evidence that is not relevant is not admissible. Evid.R. 402.

{¶ 49} Even if evidence is relevant, however, a trial court must exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). "Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid.R. 403 prohibits." *State v. Wright*, 48 Ohio St.3d 5, 8 (1990). "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001), quoting *Weissenberger's Ohio Evidence*, § 403.3, at 85-87 (2000). "If the evidence arouses the emotions or sympathies of the jury, evokes a sense of horror, or appeals to an instinct to punish, the evidence is likely unfairly prejudicial and should be excluded." *State v. Hatfield*, 2022-Ohio-148, ¶ 89 (2d Dist.), citing *Oberlin* at 172.

{¶ 50} "When determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent,

maximizing its probative value and minimizing any prejudicial effect to the party opposing admission." *State v. Lakes*, 2007-Ohio-325, ¶ 20 (2d Dist.). Evid.R. 403, like its federal counterpart, has been characterized as an "extraordinary remedy" to be used "sparingly because it permits the trial court to exclude otherwise relevant evidence." *State v. Sutherland*, 2021-Ohio-2433, ¶ 29 (2d Dist.), quoting *United States v. Meester*, 762 F.2d 867, 875 (11th Cir. 1985). "The major function of Evid.R. 403 is 'limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Id*., quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

{¶ 51} Prior to trial, Petaway filed a motion in limine pursuant to Evid.R. 403, 404(A), and 609 asking the trial court to prohibit Officer Applegate from testifying. Petaway also sought to exclude any mention that he was on parole or had any prior convictions. He further requested the court to exclude any evidence relating to Officer Applegate's discovery of evidence recovered from Petaway's home and vehicle while he was on parole, or any photographs that depicted Petaway holding firearms.

{¶ 52} The State agreed that unless Petaway were to testify, the State would not mention his prior conviction or allude to the fact that Petaway was on parole at the time of the offense. The State, however, did not agree to exclude photographs that were found on Petaway's phone. Trial Tr. 32-33. Nor did the State agree to exclude ammunition found in Petaway's house, which included ammunition that was the same brand and caliber used to shoot D.L. The trial court preliminarily determined that the ammunition and photographs were relevant and admissible so long as the proper foundation and testimony were submitted at trial. Trial Tr. 34.

{¶ 53} During Detective Heiser's testimony, Petaway's counsel objected to the admission of the magazines. During the side bar discussion, the trial court overruled

Petaway's objection to the admission of the magazines, concluding that they were relevant. There was also a brief discussion regarding the admissibility of photographs depicting Petaway with guns, during which it was mentioned that the State decided not to use them in their case-in-chief. Trial Tr. 274. Although Petaway stated that the trial court found the photographs of the gun inadmissible, there is no ruling in the transcript or any written decision in our record indicating the photographs were to be excluded. Trial Tr. 273-275.

{¶ 54} Prior to Officer Applegate's testimony, Petaway renewed his objection and reiterated his arguments made in his motion in limine. The trial court overruled his objection and permitted Officer Applegate to testify. The trial court also admitted the photographs retrieved from Petaway's cell phone. Petaway now argues that the trial court erred in admitting evidence of the ammunition and photographs and allowing Officer Applegate to testify.

### A. Officer Applegate's Testimony

{¶ 55} Officer Applegate identified himself as an employee of the State of Ohio in "a law enforcement capacity," and stated that he was familiar with Petaway through his employment but did not explain how or why he obtained knowledge of Petaway or what his job entailed. Trial Tr. 304. Both the State and defense referred to Applegate as "officer" during his testimony but there was no mention of the Adult Parole Authority, parole, or other similar language.

{¶ 56} Officer Applegate testified that he was at Petaway's home on June 5, 2023, and conducted a search of Petaway's residence and vehicle. He located a firearm holster in the center console of Petaway's car, and six or seven empty firearm boxes and a firearm cleaning kit inside Petaway's home. He also testified that Petaway's wife possessed a firearm on her person, but no other firearms were recovered.

{¶ 57} Officer Applegate further testified that he obtained a cell phone from Petaway, which was removed from Petaway's back pocket. The cell phone contained a May 11, 2023 photograph depicting Petaway holding a black semiautomatic firearm, which Petaway admitted he had been cleaning or working on at the time of the photograph. A second photograph depicted Petaway holding two firearms. One of the guns was a black semiautomatic handgun that had an extended magazine.

{¶ 58} Although Officer Applegate was not identified as Petaway's parole officer, Petaway contends that Officer Applegate's testimony made it obvious to the jury that Petaway was on parole. Petaway further argues that Officer Applegate's testimony was irrelevant and more prejudicial than probative. We disagree.

{¶ 59} "The reason for the prohibition against a reference to defendant's parole is that such a reference leads to the inference of prior convictions." *State v. McKenzie*, 1980 WL 351509, *2 (6th Dist. Sept. 5, 1980). Here, the connection between Officer Applegate's testimony and an inference of prior convictions is non-existent. There was no testimony or evidence presented to the jury that Petaway was on parole or had any prior conviction, and there was no basis for a reasonable juror to conclude that Officer Applegate was Petaway's parole officer.

{¶ 60} Prior to Officer Applegate's testimony, Detective Heiser testified that he and Dayton Police Officers searched Petaway's home on June 5, 2023. This was the same day that Officer Applegate searched Petaway's home and vehicle. The ammunition and magazines recovered in Petaway's basement, a photograph of Petaway's black Ford Fusion, and Petaway's cell phone were discussed by Detective Heiser prior to Officer Applegate's testimony. The photograph of Petaway's vehicle was first identified at trial by Detective Heiser. The detective explained that while he was on scene, Petaway's wife

19

pulled up in the black Ford Fusion. Officer Applegate similarly testified that while he was on scene, Petaway's wife arrived at the home. Officer Applegate then took the photograph of the vehicle and gave it to Detective Heiser. Throughout Detective Heiser's testimony, he mentioned bringing in other law enforcement officers into the investigation. It is far more reasonable for the jury to have concluded that Officer Applegate was present at Petaway's home to assist in the search as a fellow law enforcement officer than to speculate that Petaway was on parole, let alone that Officer Applegate was Petaway's parole officer. Accordingly, we see no abuse of discretion in the admission of Officer Applegate's testimony.

### B. Ammunition and Magazines

{¶ 61} Petaway next argues that the ammunition and extended magazines found in his basement should have been excluded at trial because they were more prejudicial than probative. We disagree.

{¶ 62} Officer Kaer testified that four Blazer Luger 9 mm casings and six MXT 9 mm casings were recovered from the scene of the shooting. Petaway's possession of numerous rounds of 9 mm ammunition and magazines relatively shortly after the shooting tended to prove that he had access to the means to commit the shooting. *State v. Drummond*, 2006-Ohio-5084, ¶ 84. Despite the lack of weapons found at his home, Petaway's possession of 9 mm ammunition and magazines tended to prove that he had access to a weapon of the same type used to shoot D.L. Furthermore, out of the hundreds of potential manufacturers of 9 mm ammunition, D.L. had the same two brands of ammunition that were used in the shooting. The Blazer Luger 9 mm ammunition and the MXT brand 9 mm ammunition found in Petaway's basement, with the same "20" imprint on them as the spent casings found at the scene of the shooting, made Petaway's involvement

20

in the shooting more probable than without this evidence. While prejudicial, we cannot say that this evidence was more prejudicial than probative.

### C. Photographs on Petaway's Phone

**{¶ 63}** Two photographs recovered from Petaway's phone were admitted at trial through the testimony of Officer Applegate. State's Exs. 24 and 25. The photographs depicted Petaway holding firearms. Petaway argues that the photographs should not have been admitted into evidence because they were irrelevant and more prejudicial than probative. Specifically, Petaway argues that there was no evidence admitted at trial that the guns belonged to him or that they were the same gun(s) used in the shooting, and no time frame was given for when the photographs were taken. Having reviewed the photographs, we cannot conclude that the trial court abused its discretion in admitting them.

**{¶ 64}** D.L. testified at trial that Petaway approached him with two black semiautomatic handguns at the time of the shooting. Evidence technicians recovered 10 fired casings from the scene of the shooting, and D.L. was shot multiple times. Ballistics analysis concluded that all 10 casings were fired from the same 9 mm semiautomatic firearm. No firearm was ever recovered that matched the ballistics of the fired casings. Police recovered a 9 mm semiautomatic firearm from Petaway's wife that was determined not to be the gun that fired the 10 rounds at D.L. No other firearms were discovered at Petaway's house. However, law enforcement discovered 6 or 7 empty gun boxes, a gun cleaning kit, several 9 mm magazines (including extended magazines), and 9 mm ammunition consistent with the same brands used during the shooting.

**{¶ 65}** State's Exhibit 24 showed Petaway holding a black semiautomatic handgun. The photograph was taken on Petaway's Apple iPhone 13 just five days before the May 16, 2023 shooting. Petaway admitted that it was his hand holding the firearm in the photograph

21

and that he was cleaning or working on the gun at the time the photograph was taken. We cannot conclude that this evidence is irrelevant or more prejudicial than probative. Although no one identified with certainty whether the black semiautomatic firearm depicted in the photograph was one of the two black semiautomatic handguns that D.L. described seeing Petaway with at the time of the shooting, the photograph was certainly probative. It reflected that Petaway had possession of and access to a handgun substantially similar to that described by D.L. shortly before the shooting. And the fact that Petaway no longer had possession of the gun he was holding in the photograph tended to make Petaway's disposal of the gun more probable. Moreover, any evidence identifying ownership of the gun depicted in the photograph would not have made the photograph any less relevant as Petaway need not have owned the gun to have used it in the shooting. Accordingly, the trial court did not abuse its discretion in admitting State's Exhibit 24.

{¶ 66} State's Exhibit 25 depicted Petaway holding a teal and silver semiautomatic firearm in his right hand and a black semiautomatic handgun with a see-through black plastic extended magazine in his left hand while sitting in a vehicle. Petaway's Apple iPhone 13 was in his lap in the photo. Testimony implied that the teal and silver firearm, which was not used during the shooting, belonged to Petaway's wife. The extended magazine in the photograph was consistent with one of the 9 mm extended magazines recovered from Petaway's home. Although there was no testimony that identified when the photograph was taken in relation to the shooting, the firearm that Petaway was holding in his left hand in State's Exhibit 25 was consistent with the description of the firearms used during the shooting. We see nothing about the photograph that would have aroused the emotions or sympathies of the jury, evoked a sense of horror, or appealed to an instinct to punish. Despite Petaway's contention that the trial court found that the photos of the guns were

22

inadmissible, the record does not reflect that the trial court made any such conclusion. Nor can we conclude that the trial court abused its discretion in not finding that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

{¶ 67} Assuming, arguendo, that State's Exhibit 25 was more prejudicial than probative, it was harmless error. Crim.R. 52(A) defines harmless error as an "error, defect, irregularity, or variance which does not affect substantial rights." In determining whether an error has affected the substantial rights of a defendant, an appellate court must first determine "whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict." *State v. Harris*, 2015-Ohio-166, ¶ 37, citing *State v. Morris*, 2014-Ohio-5052, ¶ 25, 27. "Second, it must be determined whether the error was not harmless beyond a reasonable doubt." *Id*., citing *Morris* at ¶ 28. "Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt." *Id*., citing *Morris* at ¶ 29, 33.

{¶ 68} D.L. testified consistently that he knew Petaway prior to the shooting, he clearly saw Petaway's face before being shot, and he was in fact shot multiple times. The 9 mm ammunition found at Petaway's house was consistent with the brand and size ammunition used to shoot D.L. Significantly, before seeing State's Exhibit 25, the jury had already learned about the extended magazines recovered from Petaway's home. It had heard that the firearm belonging to Petaway's wife was excluded from involvement in the shooting. And the jury had seen State's Exhibit 24 depicting Petaway shortly before the shooting holding a black semiautomatic firearm that was similar to the firearm depicted in State's Exhibit 25 and consistent with the firearms used during the shooting. There is no reason apparent in the record to conclude that the jury drew improper conclusions about Petaway's character or improperly convicted him based on the admission of State's

23

Exhibit 25. Moreover, had State's Exhibit 25 not been admitted into evidence, the remaining evidence demonstrated Petaway's guilt beyond a reasonable doubt.

{¶ 69} Having reviewed the record, we conclude that Petaway was not unfairly prejudiced by the admission of State's Exhibits 24 or 25. Therefore, the trial court did not abuse its discretion by admitting the photographs into evidence. Petaway's second assignment of error is overruled.

## IV. Cross-Examination

{¶ 70} Petaway's third assignment of error states:

The trial court abused its discretion when it sustained the state's motion in limine with respect to the complaining witness's statements to officer Applegate.

{¶ 71} The issue in this assignment of error arose during the cross-examination of D.L., which proceeded as follows:

[Defense counsel]: Do you have -- do you have any mental health problems, [D.L.]?

[D.L.]: No.

[Defense counsel]: You don't have any?

[D.L.]: Not really. I mean, I go through trauma.

Trial Tr. 209-210. Thereafter, a sidebar discussion was held at which the State objected to defense counsel's line of questioning.

{¶ 72} Defense counsel argued that D.L. had told Officer Applegate on June 7, 2023, that he had "mental health problems." According to defense counsel, if D.L. had mental health problems, then it was a mental defect under Evid.R. 616(B) on which he could cross-examine D.L. Defense counsel conceded, however, that besides D.L.'s own limited statement, he had no indication what, if any, mental health diagnosis had been made, or if

24

D.L.'s mental health affected his ability to observe, remember, or relate events. Nor did defense counsel have an expert witness to explain how D.L.'s purported mental health problems may have affected D.L.'s ability to observe, remember, or relate events. Rather, defense counsel wanted to "simply [point] out it could affect [D.L.'s] ability to remember things." Trial Tr. 211.

**{¶ 73}** After a lengthy discussion at sidebar, the court ordered a recess and the parties spoke in chambers. Thereafter, the trial court found that without having some form of diagnosis to indicate how any mental illness might have affected D.L.'s ability to perceive or relate events, the evidence was inadmissible under Evid.R. 616(B). Although defense counsel did not argue that it was an inconsistent statement, the trial court found that without knowing more about D.L.'s mental health, the question was more prejudicial than probative and was not admissible even as an inconsistent statement. Trial Tr. 220. The State successfully moved to strike defense counsel's question and D.L.'s answer. A copy of the statement made by D.L. to Officer Applegate was later submitted as a defense exhibit for purposes of appellate review.

**{¶ 74}** "Cross-examination of a witness is a matter of right, but the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" *State v. Green*, 66 Ohio St.3d 141, 147 (1993), quoting *Alford v. United States*, 282 U.S. 687, 691, 694 (1931). "Thus, a trial court's decision to admit or exclude evidence 'will not be reversed unless there has been a clear and prejudicial abuse of discretion.'" *State v. Hancock*, 2006-Ohio-160, ¶ 122, quoting *O'Brien v. Angley*, 63 Ohio St.2d 159, 163 (1980).

**{¶ 75}** Petaway argues that the trial court abused its discretion when it prohibited him from cross-examining D.L. regarding his mental health, which he contends should have been

25

admissible as a prior inconsistent statement pursuant to Evid.R. 613(B). Appellant's Brief, p. 14. Petaway did not argue the applicability of Evid.R. 613(B) in the trial court. Rather, he argued that the evidence was admissible under Evid.R. 616(B). Nevertheless, the trial court considered whether the statement was admissible as a prior inconsistent statement and found that the evidence was more prejudicial than probative and precluded its admission.

{¶ 76} Evid.R. 613(A) states that "[i]n examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel." "Prior inconsistent statements may be utilized to impeach a witness 'on the theory that the making of two different statements with regard to the same event calls into question the truthfulness of the witness, regardless of the truth or falsity of either of the statements.'" *State v. Harrison*, 2022-Ohio-4627, ¶ 21 (2d Dist.), quoting *State v. Young*, 2021-Ohio-2541, ¶ 56 (12th Dist.).

{¶ 77} Evid.R. 613(B) allows the use of extrinsic evidence to impeach by prior inconsistent statement when the following two conditions are satisfied:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;

(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(B), or 706;

(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

{¶ 78} "The foundational requirements of Evid.R. 613(B) necessary for admission of extrinsic evidence of a prior inconsistent statement are: (1) the former statement is presented to the witness; (2) the witness is asked whether he or she made the statement; (3) the witness is given an opportunity to admit, deny, or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the prior inconsistent statement." *State v. Hill*, 2004-Ohio-2048, ¶ 36 (2d Dist.), citing *State v. Keith*, 79 Ohio St.3d 514, 525 (1997). Under this rule, if the witness admits making the conflicting statement, then there is no need for the use of extrinsic evidence. *State v. Richardson*, 2016-Ohio-8081, ¶ 51 (2d Dist.). "If the witness denies making the statement, extrinsic evidence may be admitted, provided the opposing party has an opportunity to query the witness about the inconsistency, and provided the 'evidence does not relate to a collateral matter.'" *Id.*, quoting *State v. Robinson*, 2015-Ohio-8081, ¶ 28 (2d Dist.), citing *State v. Pierce*, 2011-Ohio-4873, ¶ 82 (2d Dist.).

{¶ 79} It is clear from the record that defense counsel's intent was not to cross-examine D.L. concerning a prior inconsistent statement. Defense counsel's question asking D.L. if he had "any mental health problems" was overly broad. Because D.L. was not presented with a specific question concerning his allegedly prior inconsistent statement, no foundation was laid for its admission. Petaway has therefore failed to demonstrate that the trial court excluded testimony that it should have allowed. *State v. Mack*, 73 Ohio St.3d 502, 514-515 (1995).

**{¶ 80}** As defense counsel argued at trial, Petaway's intent was to point out that D.L.'s mental health "could affect his ability to remember things." Trial Tr. 211. Yet, there was no proffer from defense counsel to indicate how having mental health issues affected D.L.'s ability to observe and to testify to what he observed. "'In appropriate cases psychiatric testimony can be used to impeach a witness whose ability to perceive, remember, or relate events is allegedly impaired by organic illness or a psychiatric disorder.'" *State v. Bickerstaff*, 2015-Ohio-4014, ¶ 25 (11th Dist.), quoting *State v. Wilson*, 8 Ohio App.3d 216, 221 (8th Dist. 1982). "When psychiatric or psychological conditions are at issue, Ohio courts have required the questioner to establish a nexus between the specific condition or treatment and the witness's credibility." *State v. Hemming*, 2021-Ohio-971, ¶ 43 (2d Dist.).

**{¶ 81}** Here, the trial court reasonably concluded that counsel's question intended to elicit information about D.L.'s mental health diagnosis without a foundation that he had a condition that did, in fact, impair his memory of events or his ability to perceive the events. The trial court's ruling did not preclude defense counsel from asking D.L. whether he was taking any medication that may have affected his ability to perceive, recall, or relate events that had occurred, and it did not restrict defense counsel from simply asking if D.L. had difficulties with his memory. *Id.* at ¶ 53.

**{¶ 82}** Petaway has failed to demonstrate how exclusion of D.L.'s potential mental health issues resulted in material prejudice. The only evidence that D.L. might have had mental health issues was his limited, non-specific statement to Officer Applegate. There was no evidence that D.L. had been diagnosed with anything that affected his memory. Accordingly, we cannot conclude that the trial court abused its discretion in limiting defense counsel's cross-examination.

28

**{¶ 83}** Petaway also cites Evid.R. 616(A) regarding bias, though that argument was not raised at trial. Having failed to raise that argument in the trial court, Petaway has waived all but plain error. *State v. Teater*, 2019-Ohio-143, ¶ 15 (2d Dist.); Crim.R. 52(B). Plain error does not exist unless it can be said that but for the error, the outcome of the trial clearly would have been different. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. A court recognizes plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. at paragraph three of the syllabus.

**{¶ 84}** Evid.R. 616(A), provides that evidence of "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." Petaway has not explained how evidence of a potential mental health issue would establish evidence of "bias, prejudice, interest, or any motive to misrepresent." Nor is it readily apparent how this rule has any applicability in Petaway's case. It is not the duty of the appellate court to construct and develop arguments to support an appellant's assignment of error. *State v. McGhee*, 2006-Ohio-5979, ¶ 16 (2d Dist.), citing *State v. Brown*, 1998 WL 487039 (9th Dist. Aug. 19, 1998).

**{¶ 85}** Petaway's third assignment of error is overruled.

## V. Manifest Weight and Sufficiency

**{¶ 86}** Petaway's fourth assignment of error states:

The State's evidence was insufficient as a matter of law and Petaway's convictions were against the manifest weight of the evidence.

**{¶ 87}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10

29

(2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Notably, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 2011-Ohio-1024, ¶ 42 (10th Dist.). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Dennis* at 430, citing *Jenks* at 273.

{¶ 88} When reviewing an argument challenging the weight of the evidence, an appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). An appellate court may not substitute its view for that of the trier of fact. *State v. Weller*, 2024-Ohio-2554, ¶ 10 (2d Dist.). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 89} We first address the issue of sufficiency. Petaway was convicted of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1). Therefore, the State was required to prove that Petaway knowingly caused serious physical harm to D.L. The three-year firearm specification further required the State to prove that Petaway had a firearm on or about his person or under his control while committing the offense and displayed the

30

firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense. R.C. 2941.145(A). Petaway does not contest that D.L. was seriously injured by a firearm, only that the State failed to prove that he was the person who committed the offense.

{¶ 90} The testimony provided by D.L., if believed, established that he saw Petaway walk up to him with a black semiautomatic firearm in each hand and fire at him. D.L. was familiar with Petaway prior to the shooting and observed Petaway in the daylight. Petaway and D.L. were face-to-face when Petaway started shooting and the view of Petaway's face was unobstructed. After about five shots, D.L. tried to run away but fell, and Petaway continued shooting at D.L., who had fallen to the grass. D.L. was shot multiple times and was severely injured. D.L. immediately told police when they arrived on scene that he was shot by "B," which was Petaway's nickname. Once D.L. obtained his cell phone, he provided police with Petaway's full name. D.L. identified Petaway in a photospread with 100% certainty as the person who shot him, and he identified Petaway at trial, again with 100% certainty.

{¶ 91} Four spent Blazer Luger 9 mm casings and six spent MXT 9 mm casings with a "20" imprint on the head of the casings were recovered from the scene of the shooting. Both Blazer Luger 9 mm cartridges and MXT 9 mm cartridges, also with a "20" imprint on the head, were recovered from Petaway's home. Several empty gun boxes and a gun cleaning kit were found in Petaway's basement. The only firearm recovered was in possession of Petaway's wife and was not the gun used to shoot D.L. Nevertheless, days prior to the shooting, Petaway had possessed a black semiautomatic handgun consistent with those used during the shooting. We conclude that Petaway's conviction was supported by sufficient evidence.

{¶ 92} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Robinson*, 162 Ohio St. 486, 487 (1955). In support of Petaway's argument that his conviction is against the manifest weight of the evidence, he points to several alleged inconsistencies in D.L.'s testimony to suggest that D.L. lacked credibility and argues that there was a lack of physical evidence that tied him to the scene.

{¶ 93} Having reviewed the entire record, we conclude that Petaway's conviction is not against the manifest weight of the evidence. The evidence at trial established that D.L. was shot multiple times by a black 9 mm semiautomatic handgun and suffered serious physical harm as a result. D.L.'s testimony established that Petaway, with whom D.L. was familiar and recognized, shot D.L. Despite the discrepancies Petaway alleges, the jury had the ability to see and hear the witnesses and determine D.L.'s credibility. D.L. was thoroughly cross-examined on the purported inconsistencies in his testimony. The jury heard the cross-examination and considered the same. "In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness . . . and to draw reasonable inferences from the evidence presented." *State v. Dewberry*, 2020-Ohio-691, ¶ 44 (2d Dist.). "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986), citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984), and *Henkle v. Salem Mfg. Co.*, 39 Ohio St. 547 (1883).

{¶ 94} Finally, Petaway's argument concerning the lack of evidence that tied him to the shooting is not persuasive. D.L. observed Petaway commit the shooting and D.L. was

32

familiar with Petaway. Petaway did not conceal his face, it was daylight, and Petaway was approximately five feet away from D.L. when Petaway began shooting. D.L. was 100% confident that Petaway was the perpetrator who shot him. If D.L.'s testimony is believed, then the lack of additional witnesses, photographs, or other physical evidence does not render the verdict against the manifest weight of the evidence. *State v. Jackson*, 2009-Ohio-6407, ¶ 16 (7th Dist.).

**{¶ 95}** Considering all the evidence presented in this case, we cannot conclude that the jury lost its way and created such a manifest miscarriage of justice as to require reversal of Petaway's conviction. This is not the exceptional case in which the evidence weighs heavily against the conviction. Accordingly, Petaway's fourth assignment of error is overruled.

## VI. Cumulative Errors

**{¶ 96}** Petaway's fifth assignment of error states:

Petaway was denied due process of law and a fair trial due to the cumulative

effect of errors by the trial court.

**{¶ 97}** Petaway contends that the cumulative errors of the trial court, considered together, denied him a fair trial. Under the cumulative error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 2012-Ohio-2577, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197 (1987). But even if there are some errors, they do not "become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), citing *State v. Davis*, 62 Ohio St.3d 326, 348 (1991).

{¶ 98} In support of his cumulative error argument, Petaway relies on the arguments made in his prior assignments of error regarding the purported improper admission of evidence. Having rejected Petaway's prior arguments, we cannot conclude that the trial court committed cumulative errors, let alone that Petaway was deprived of a fair trial.

{¶ 99} Petaway's fifth assignment of error is overruled.

## VII. Reagan Tokes

{¶ 100} Petaway's sixth assignment of error states:

Petaway's sentence pursuant to Reagan Tokes is unconstitutional and contrary to law.

{¶ 101} Petaway acknowledges that both the Ohio Supreme Court and this court have upheld the constitutionality of the Reagan Tokes Law, but he nevertheless asserts that it violates the separation of powers doctrine and denied him his due process rights. Petaway states that his arguments are set forth "to preserve them for the record and, again, urges this Court to reconsider its decisions and find S.B. 201 unconstitutional under both the United States and Ohio Constitutions." Appellant's Brief, p. 25.

{¶ 102} As an initial matter, we note that Petaway failed to object to the constitutionality of the Reagan Tokes Law in the trial court, meaning that he has waived the issue on appeal. *State v. Jinks*, 2022-Ohio-282, ¶ 12 (2d Dist.). Significantly, the Ohio Supreme Court has addressed the constitutionality of the Reagan Tokes Law and held that it does not violate the separation-of-powers doctrine or due process. *State v. Hacker*, 2023-Ohio-2535. Based on *Hacker*, we overrule Petaway's sixth assignment of error.

## VIII. Firearm Specifications

{¶ 103} Petaway's seventh assignment of error states:

Whether the trial court's imposition of consecutive gun specifications was

contrary to both statutory and constitutional law.

{¶ 104} Petaway argues that his sentence is contrary to law because the trial court imposed a sentence for a firearm specification on an underlying offense that was merged with another offense at the time of sentencing. The State, on the other hand, relies on *State v. Bollar*, 2022-Ohio-4370, for the contention that R.C. 2929.14(B)(1)(g) permits the imposition of two three-year firearm specifications to run prior to and consecutive to the underlying felony, even when one specification rests on another charge that merged for purposes of sentencing.

{¶ 105} "When reviewing felony sentences, a court of appeals must apply the standard of review set forth in R.C. 2953.08(G)." *State v. Williams*, 2022-Ohio-2897, ¶ 18 (2d Dist.), citing *State v. Farra*, 2022-Ohio-1421, ¶ 73 (2d Dist.). "Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it 'clearly and convincingly' finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2021-Ohio-2788, ¶ 13 (2d Dist.), citing *State v. Huffman*, 2017-Ohio-4097, ¶ 6 (2d Dist.). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 106} R.C. 2929.14(B)(1)(b) provides that "[e]xcept as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." The general rule in R.C. 2929.14(B)(1)(b) is subject to the exception set forth in R.C. 2929.14(B)(1)(g), which addresses the imposition of a sentence for firearm

specifications when an offender has been found guilty of multiple felony offenses (and at least one is a felony listed in the statute) and multiple firearm specifications. It provides:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are . . . felonious assault, . . . and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

R.C. 2929.14(B)(1)(g). "The Ohio Supreme Court has interpreted this language to require trial courts to impose prison terms for the two most serious firearm specifications, even when one of the firearm specifications was attached to an offense that was merged at sentencing as an allied offense of similar import." *State v. Smith*, 2025-Ohio-679, ¶ 77 (2d Dist.), citing *Bollar*, 2022-Ohio-4370.

{¶ 107} Petaway was convicted of felonious assault, one of the offenses identified in R.C. 2929.14(B)(1)(g) as triggering the requirement that the trial court impose prison terms for the two most serious firearm specifications. He was also convicted of the three-year firearm specifications that were attached to his felonious assault convictions. At sentencing, the trial court merged both counts of felonious assault. The court imposed a mandatory indeterminate minimum sentence of 8 years in prison to a maximum of 12 years in prison for the single underlying felonious assault charge. The court also imposed a mandatory three-year prison term for each of the two firearm specifications, even though the

36

second felonious assault count had been merged, and ordered the three-year terms to run prior to and consecutive to the indefinite prison term on the underlying felonious assault charge. This sentence was reflected in the judgment entry.

{¶ 108} Petaway concedes that under *Bollar*, the Ohio Supreme Court majority interpreted R.C. 2929.14(B)(1)(g) as allowing courts to impose consecutive sentences for specifications attached to merged offenses. However, Petaway disagrees with the majority's opinion in *Bollar* and argues that the dissenting opinion is more consistent with the statutory scheme for sentencings. Despite Petaway's argument, we are bound to follow the Ohio Supreme Court's ruling. *Cooke v. Montgomery Cty.*, 2004-Ohio-3780, ¶ 39 (2d Dist.) ("Appellate courts are bound by and must follow decisions of the Ohio Supreme Court, which are regarded as law unless and until reversed or overruled."). Accordingly, Petaway's sentence is not contrary to law, and his seventh assignment of error is overruled.

## IX. Conclusion

{¶ 109} Having overruled Petaway's assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.